SECOND DIVISION

May 11, 2004

 No. 1-02-3420

ILLINOIS RSA No. 3, INC.; USCOC OF ILLINOIS RSA No. 4, INC.; DAVENPORT CELLULAR TELEPHONE COMPANY; and USCOC OF ILLINOIS RSA No. 1, INC.,

Plaintiffs-Appellees,

v.

THE DEPARTMENT OF CENTRAL MANAGEMENT SERVICES,

Defendant-Appellant.

)

)

)

)

)

)

)

)

)

)

)

)

Appeal from

the Circuit Court

of Cook County

No. 01 CH 12217

       

Honorable

Donald J. O'Brien,

Judge Presiding.

MODIFIED ON DENIAL OF REHEARING

JUSTICE CAHILL delivered the opinion of the court:

We consider whether defendant, the Illinois Department of Central Management Services (CMS), had the authority to promulgate a rule that wireless carriers could recover no more than 100% of a surcharge.  The surcharge is to be collected and remitted to a fund established to defray carriers' expenses in establishing 9-1-1 emergency service.  The issue and the validity of the rule arises because the Wireless Emergency Telephone Safety Act (Act) (50 ILCS 751/1 
et seq.
 (West 2002)) allows wireless carriers to receive up to 125% of the amount collected in surcharges.  The plaintiffs filed a complaint in the circuit court in 2001, claiming the CMS 100% rule conflicts with the Act.  The circuit court granted summary judgment in favor of plaintiffs and CMS appeals.  We affirm.

The Act, which became effective in July 1999, provides, "it is in the public interest to promote the use of wireless 9-1-1 and wireless enhanced 9-1-1 (E9-1-1) service in order to save lives and protect the property of the citizens of the State of Illinois."  50 ILCS 751/5 (West 2002).  The legislature recognized:

"[W]ireless carriers ***  require adequate funding to recover the costs of designing, purchasing, installing, testing, and operating enhanced facilities, systems, and services necessary to comply with the wireless E9-1-1 requirements mandated by the Federal Communications Commission [(FCC)] and to maximize the availability of wireless E9-1-1 services throughout the State of Illinois."  50 ILCS 751/5 (West 2002). 

Section 5 of the Act encourages wireless carriers to provide 9-1-1 services "that will assist public safety agencies in determining the caller's approximate location and wireless telephone number" and to reimburse wireless carries for the costs they incur.  50 ILCS 751/5 (West 2002).

Section 17 of the Act establishes a surcharge on telephone bills to reimburse carriers' costs: 

"(a) *** [E]ach wireless carrier shall impose a monthly wireless carrier surcharge per *** connection that either has a telephone number within an area code assigned to Illinois *** or has a billing address in this State.  ***  

(b) *** [A] wireless carrier shall, within 45 days of collection, remit *** to the State Treasurer the amount of the wireless carrier surcharge collected from

each subscriber.  Of the amounts remitted under this subsection, the State 

Treasurer shall deposit one-third into the Wireless Carrier Reimbursement Fund [(WCRF)] ***."  50 ILCS 751/17(a), (b) (West 2002).  

The amount of the surcharge is to be set by a Wireless Enhanced 9-1-1 Board, but the charge may not exceed $.75 per month per connection.  50 ILCS 751/15(c) (West 2002).  

Section 30 of the Act establishes the WCRF as a separate fund of the State treasury:

"Moneys in the [WCRF] may be used, subject to appropriation, only to reimburse wireless carriers for 
all
 [emphasis added] of their costs incurred in complying with the *** [FCC] wireless enhanced 9-1-1 service mandates ***.  This reimbursement may include, but need not be limited to, the cost of designing, upgrading, purchasing, leasing, programming, installing, testing, and maintaining necessary data, hardware, and software and associated operating and administrative costs and overhead."  50 ILCS 751/30 (West 2002).  

Section 35 outlines the procedures to be followed by carriers seeking reimbursement under the Act:

"To recover costs from the [WCRF], the wireless carrier shall submit sworn invoices to [CMS].  In no event may any invoice for payment be approved for (i) costs that are not related to compliance with the requirements established by the wireless enhanced 9-1-1 mandates of the [FCC], (ii) costs with respect to any wireless enhanced 9-1-1 service that is not operable at the time the invoice is submitted, or (iii) costs of any wireless carrier exceeding 125% of the wireless emergency services charges remitted to the [WCRF] by the wireless carrier *** unless the wireless carrier received prior approval for the expenditures from [CMS]."  50 ILCS 751/35 (West 2000). 

Section 35 further provides, "[CMS] shall adopt rules to govern the reimbursement process."  50 ILCS 751/35 (West 2002).

CMS promulgated an administrative rule governing reimbursements under the Act: 

"Moneys in the WCRF may be used, subject to appropriation, only to reimburse Carriers for costs incurred in complying with the applicable provisions of FCC wireless enhanced 9-1-1- service mandates and to pay Administrative Costs.  In no event shall any sworn invoice submitted to [CMS] for reimbursement be approved for: 

* * * 

(d) An amount in excess of 100% of an individual Carrier's cumulative remittances to the WCRF, net Administrative Costs and prior Reimbursements."  83 Ill. Adm. Code §1000.500 (2003).

Plaintiffs filed a motion for summary judgment, asserting that the CMS rule denying reimbursement for invoices over 100% of the carrier's remittances to the WCRF was invalid because it conflicted with the 125% figure in section 35 of the Act.  50 ILCS 751/35 (West 2002) (costs over 125% of the carrier's remittances will be denied unless the carrier obtains advance approval).  Plaintiffs described the potentially negative impact of the CMS rule:

"This limitation directly prejudices a wireless carrier, like US Cellular, that has a relatively small number of customers in Illinois from whom it collects the monthly surcharge.  ***  For example, a carrier with a relatively small number of customers will pay $1 million to create and provide emergency 911 services.  Because the carrier has a relatively small number of customers on which it imposes the 75 cents per month surcharge, the carrier collects and remits only $500,000 to the Fund.  
Under the Act
, the carrier is able to obtain up to 125% of its remittances–or $600,000–for its $1 million costs, and the carrier has the ability to obtain more reimbursement if it first obtains the prior approval of [CMS] for the costs.  
Under the Administrative Rules
, the carrier is only able to obtain up to 100% of its remittances–or $500,000–for its $1 million costs, and there is no ability to obtain more reimbursement by obtaining the prior approval of the [CMS]."  (Emphasis in original.)

CMS filed a cross-motion for summary judgment, arguing that it did not exceed its rule-making authority and the rule did not conflict with the Act because the Act establishes a "ceiling" not a "floor" of 125% for reimbursements to a carrier without advance CMS approval.

The trial court disagreed in a written opinion, granting plaintiffs' motion for summary judgment.  While we review the trial court's grant of summary judgment 
de novo
 (
Sterdjevich v. RMK Management Corp.
, 343 Ill. App. 3d 1, 14, 796 N.E.2d 1146 (2003)), we would be hard pressed to improve on the reasoning in the trial court's opinion:

"While this court agrees with the CMS interpretation of the enabling statute that the statute does not require that the carriers be reimbursed in the amount of 125%, the statute does however require defendant to consider a reimbursement of up to 125%.  By implementing a maximum amount of reimbursement of up to 100% based on defendant's interpretation of the statute, defendant directly contradicts 50 ILCS 751/35.  While defendant argues that the granting of up to 125% is discretionary, by limiting the amount of reimbursement to 100%, defendant effectively precludes recovery from 100-125%. ***

*** [A] maximum amount of 100% on reimbursal directly contradicts the statute.  ***  This court does not find a grant of authority within this statute to eliminate these mandatory obligations."

 An administrative agency such as CMS has only such authority as conferred by statute.  
Aurora East Public School District No. 131 v. Cronin
, 92 Ill. App. 3d 1010, 1014, 415 N.E.2d 1372 (1981).  An administrative rule is invalid if it conflicts with the language of the statute under which the rule was adopted.  
Aurora
, 92 Ill. App. 3d at 1014.  To determine whether an administrative rule conflicts with its enabling act, the court should "ascertain and give effect to the intent of the legislature."  
Henrich v. Libertyville High School
, 186 Ill. 2d 381, 387, 712 N.E.2d 298 (1998).  While administrative rules interpreting a statute serve as guides to legislative intent, the rules are binding on the court only to the extent that they follow the statute.  
 National Pride of Chicago, Inc. v. City of Chicago
, 206 Ill. App. 3d 1090, 1101, 562 N.E.2d 563 (1990).  "Administrative rulings can neither limit, enlarge nor amend the scope of the statute beyond the clear import of the legislative language used."  
National Pride
, 206 Ill. App. 3d at 1101. 

CMS relies on 
R.L. Polk & Co. v Ryan
, 296 Ill. App. 3d 132, 141, 694 N.E.2d 1027 (1998), to argue that it should be allowed to adopt a blanket rule capping reimbursements at 100% of remittances.  In 
Polk
, the court determined that the Secretary of State had the authority to adopt a blanket rule denying the sale of Illinois driver and vehicle records to firms specializing in the sale of mailing lists for commercial solicitation.  
Polk
, 296 Ill. App. 3d at 135.  The plaintiff in 
Polk
 relied on the language of the 
Illinois Vehicle Code, stating that the Secretary "may, in his discretion," sell vehicle or driver data (625 ILCS 5/2-123(b) (West 1996)) and "shall" do so by written agreement (625 ILCS 5/2-123(e-1) (West 1996)), to argue that the Secretary could not refuse to sell the information.  The court disagreed, holding that the statute specifically granted the Secretary discretion to sell or not to sell the lists.  
Polk
, 296 Ill. App. 3d at 141.  CMS here argues that the decision in 
Polk
 authorizes CMS to exercise its discretion in setting the level of reimbursement available to carriers. 

 We disagree.  The court in 
Polk
 determined that the legislature specifically granted the Secretary "discretion" to decide under what circumstances to sell or not sell the lists.  The Act here makes no equivalent grant of discretion to CMS, but only authorizes CMS to "adopt rules to govern the reimbursement process" (50 ILCS 751/35 (West 2002)).  Under the law, reimbursements can be up to 125% of remittances without advance approval and more than 125% with advance approval.  

The judgment of the circuit court is affirmed.

Affirmed.  

WOLFSON, P.J., and BURKE, J., concur.