# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Julie Q. v. Department of Children & Family Services*, 2011 IL App (2d) 100643

---

| | |
|---|---|
| Appellate Court Caption | JULIE Q., Plaintiff-Appellant, v. THE DEPARTMENT OF CHILDREN AND FAMILY SERVICES and ERWIN McEWEN, as Director of the Department of Children and Family Services, Defendants-Appellees. |
| District & No. | Second District<br>Docket No. 2-10-0643 |
| Filed | December 22, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | An indicated finding of neglect arising from an incident in 2008 in which plaintiff was allegedly intoxicated and locked her child in her bedroom was reversed, since the finding was against the manifest weight of the evidence where the administrative law judge improperly relied on other, unfounded incidents involving plaintiff's abuse of alcohol to impeach plaintiff's testimony that she had been sober since 2006. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 09-MR-1461; the Hon. Raymond J. McKoski, Judge, presiding. |
| Judgment | Vacated and reversed. |

Counsel on
Appeal

Elizabeth Butler and Melissa L. Staas, both of Family Defense Center, and Michael T. Brody and Michael F. Otto, both of Jenner & Block, LLP, both of Chicago, for appellant.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Jan E. Hughes, Assistant Attorney General, of counsel), for appellees.

Panel

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Justice Zenoff concurred in the judgment and opinion.
Justice Birkett specially concurred, with opinion.

## OPINION

¶ 1     In this administrative review proceeding, plaintiff, Julie Q., appeals the trial court's judgment affirming the indicated finding of defendants, the Department of Children and Family Services (DCFS) and Erwin McEwen, in his capacity as director of DCFS, which found that plaintiff neglected her minor child, M.Q. This appeal stems from DCFS's March 13, 2009, determination that plaintiff should be indicated for child neglect in the State Central Register. Plaintiff appealed the indicated finding through DCFS administrative procedures, and DCFS denied plaintiff's appeal. Plaintiff brought an administrative review action in the trial court. On June 2, 2010, the trial court affirmed the administrative ruling. Plaintiff now appeals from the trial court's judgment.

¶ 2     Plaintiff contends that we should reverse the trial court's judgment and vacate DCFS's indicated finding. In support, plaintiff argues that (1) DCFS's indicated finding is invalid because the allegation that forms the basis of the finding is void as a matter of law; (2) DCFS's indicated finding was against the manifest weight of the evidence; and (3) DCFS's indicated finding must be expunged because DCFS failed to provide plaintiff with a timely resolution of her appeal. We reverse the trial court's decision and vacate the indicated finding.

¶ 3     The indicated finding of child neglect stemmed from an incident that took place on January 29, 2009. At approximately 9 p.m. on that date, plaintiff, a recovering alcoholic, and M.Q., plaintiff's nine-year-old child, had a disagreement after M.Q. repeatedly left her bed and asked to sleep with plaintiff. Plaintiff insisted that M.Q. sleep in her own bed. The following day, M.Q. informed her father Chris Q., plaintiff's estranged husband, that plaintiff had locked her in her room and that she believed that plaintiff had been drinking. Chris reported the incident to DCFS.

¶ 4 On February 17, 2009, plaintiff received a phone call from DCFS investigator Lavern Robinson. Robinson informed plaintiff that DCFS had received a complaint that on the evening of January 29, 2009, plaintiff had locked M.Q. in her bedroom. DCFS was investigating whether plaintiff should be indicated as neglecting M.Q., based on allegation No. 10/60 as found in title 89, appendix B, of the Illinois Administrative Code. Allegation No. 10/60 is entitled, "Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare," and provides that a parent has harmed a child in such a manner that:

> "the total circumstances lead a reasonable person to believe that the child is in substantial risk ***. This allegation of harm also includes *** placing a child in an environment that is injurious to the child's health and welfare ***." 89 Ill. Adm. Code 300, app. B, No. 10/60 (2011).

Plaintiff denied the allegation and informed Robinson that M.Q.'s bedroom door did not have a lock. Plaintiff admitted to Robinson that she had a history of alcohol addiction but stated that she was not drinking on January 29, 2009. The following day, Robinson visited plaintiff's home. M.Q. reported to Robinson that she was not locked in her room on January 29, 2009, but that she was frightened and could not use the telephone that evening because she was told not to come out of her room. She further reported that she believed that plaintiff was drinking that evening because plaintiff slurred her speech. Robinson believed that M.Q. was credible.

¶ 5 Robinson requested that plaintiff be evaluated by the Northern Illinois Council on Alcohol and Substance Abuse (NICASA). Ana Ramos, a substance abuse counselor with NICASA, counseled plaintiff from March 24, 2009, until April 28, 2009. During this time, plaintiff attended classes at NICASA twice weekly and was tested for drugs and alcohol; all tests were negative.

¶ 6 Robinson spoke with her supervisor and determined that, due to plaintiff's history of drinking in the home, the injurious environment it created, and the substantial risk of injury to M.Q., plaintiff should be indicated for neglect. Robinson made the determination "based on [plaintiff's] history of drinking in the home is where the alleged incident takes [*sic*] place, the substantial risk of injury or environment is [*sic*] risk to the health of the child."

¶ 7 On March 13, 2009, DCFS entered its initial indicated finding of neglect against plaintiff. On March 27, 2009, plaintiff filed a notice of appeal with DCFS. Numerous continuances followed; the parties dispute which party caused the various continuances. On June 23, 2009, an administrative hearing commenced.

¶ 8 Plaintiff testified regarding the events of January 29, 2009. She admitted that she and M.Q. became engaged in a disagreement sometime after 9 p.m. because M.Q. repeatedly left her bed, but she stated that M.Q. was not physically prevented from leaving her room. Plaintiff testified that she did not drink alcohol on January 29, 2009, but admitted that she was a recovering alcoholic.

¶ 9 Plaintiff testified that, in 2004, she was acquitted of driving under the influence. She testified that, in 2005, she pleaded guilty to driving under the influence and was charged with but not convicted of domestic violence. Thereafter, she received inpatient substance abuse treatment twice: in July 2005 and in January 2006. She testified that in early 2009 she was

attending Alcoholics Anonymous meetings two to four times per week and attending sessions once a week with a substance abuse therapist, David Gates, where she was randomly tested for alcohol. Plaintiff testified that without prior warning, Gates would test her saliva for any trace of alcohol; all tests were negative. Plaintiff further testified that she had been sober for three years prior to the alleged January 2009 incident.

¶ 10    After plaintiff testified regarding her sobriety, DCFS inquired about an incident in July 2008, when the Lake Bluff police came to her home. Counsel for plaintiff objected, arguing that the incident was irrelevant to the January 2009 incident. DCFS responded that, because plaintiff testified that she had been sober since 2006, the July 2008 incident was "dispositive as to whether she's been maintaining her sobriety or not." DCFS's administrative law judge (the ALJ) overruled the objection.

¶ 11    Plaintiff testified that, in July 2008, M.Q. called 911 claiming that she found an open bottle of wine and a full glass of wine in their home while plaintiff was asleep. Plaintiff testified that she was not drinking that night and that she refused to take a Breathalyzer test when the police offered her one, because she was angry that the police were in her home, going through her cabinets.

¶ 12    Over further objection by plaintiff's counsel, opposing counsel questioned plaintiff regarding another incident, in May 2009. Plaintiff testified that, after plaintiff grounded M.Q. because she lied about doing her homework, M.Q. called Chris, and Chris called the police. The police arrived at plaintiff's home and asked her to take a Breathalyzer test. Plaintiff testified that she agreed to the test but that the officers left without administering it, after receiving an emergency dispatch. Plaintiff testified that she agreed to let the police take M.Q. and place her in Chris's custody, although she was not happy about it. Plaintiff testified that DCFS had investigated the events of July 2008 and May 2009 and that on both occasions the reports were deemed unfounded.

¶ 13    Over further objection by plaintiff's counsel that the incidents were collateral, the ALJ permitted DCFS to introduce police testimony regarding the July 2008 and May 2009 incidents. Lake Bluff police sergeant Keith Landy testified that, on July 26, 2008, he and another officer responded to a call at plaintiff's address. According to the dispatch, a minor child could not wake her mother and was frightened. Upon the officers' arrival, M.Q. told the officers that she was unable to wake her mother and thought that her mother was drunk. M.Q. showed the officers a glass containing a liquid that Landy believed was wine. Landy testified that, although plaintiff was awake when he entered the home, he believed that she was under the influence of alcohol, because she had glassy eyes, had slurred speech, and smelled of alcohol. Landy testified that plaintiff did not take a Breathalyzer test, but he could not recall why the test was not administered. Landy testified that he did not take M.Q. into protective custody, because the house was neat, there was food in the refrigerator, and "there was no imminent danger to [M.Q.]; her mom was just sleeping in the bedroom."

¶ 14    Lake Bluff police officer Lisa Davidson testified that, in May 2009, she responded to a call at plaintiff's home for an "unknown problem." Davidson testified that, when she arrived, M.Q. met her outside the house and told her that plaintiff was drinking. M.Q. also told Davidson that "her mom had 'slurped' her words" and "threw a glass towards her."

-4-

According to Davidson, plaintiff denied that she was drinking and denied that she threw a glass at M.Q. Davidson testified that she did not observe plaintiff slur her words, did not smell alcohol on plaintiff's breath, and observed nothing that indicated that plaintiff had been drinking. Davidson testified that plaintiff agreed to take a Breathalyzer test but that the test was never administered because Davidson received another dispatch call and never returned.

¶ 15    Dr. Frances Pacheco, a court-appointed custody evaluator, testified on behalf of DCFS. Pacheco testified that she recommended that Chris be granted sole custody because, based on statements by Chris, M.Q., and plaintiff's other child, Pacheco "had some concerns that [plaintiff] had relapsed, that she was drinking alcohol." Pacheco admitted that Chris had told M.Q. "many things that are inappropriate to tell a child," including "inappropriate things about [plaintiff's] alcoholism" which could have caused M.Q. to have an increased level of fear regarding alcoholism. Pacheco also admitted that she was aware that M.Q.'s school had identified M.Q. as having behavioral issues relating to untruthfulness.

¶ 16    Chris testified that plaintiff had received inpatient treatment for alcoholism and he testified regarding plaintiff's struggles with alcohol. He admitted that he was not at plaintiff's home on January 29, 2009. He testified that from 2006 through 2009, M.Q. complained to him that plaintiff was drinking. Chris admitted that M.Q. had lied about being locked in her room on the evening of January 29, 2009. The June 23, 2009, hearing recessed at 6 p.m., before DCFS concluded its case in chief. The matter was continued to July 20, 2009.

¶ 17    On July 20, 2009, DCFS continued its case in chief. Robinson testified regarding her investigation. DCFS offered into evidence plaintiff's entire DCFS file, including the notes of another DCFS investigator, Analia Cobrda, from a prior interview with M.Q. Plaintiff objected to the admission of those notes on hearsay grounds, as Cobrda did not testify. Plaintiff's objection was overruled, and the entire file was admitted into evidence because the notes concerned M.Q.'s statements regarding abuse and neglect. According to Cobrda's notes, M.Q. told her that on January 29, 2009, she did not see any alcoholic beverages but believed that her mother was drunk because she was slurring her words, smelled like alcohol, and was not acting like herself. Robinson admitted that she had not met Cobrda. She further admitted that she considered Cobrda's notes when determining that plaintiff should be indicated for neglect.

¶ 18    After DCFS rested, plaintiff called several witnesses. Gates testified as a stipulated expert in family therapy and alcohol and substance abuse. He testified that he counseled plaintiff between December 2008 and April 2009. In his opinion, in 2006, plaintiff was in the late stage of alcoholism. He testified that it was highly unlikely that plaintiff could drink intermittently, because late-stage alcoholics have completely lost control. Gates testified that he administered random alcohol tests to plaintiff during February and March of 2009. All tests were negative. Gates testified that, as far as he knew, plaintiff was a recovering alcoholic. Although he could not guarantee that plaintiff was not drinking, he testified that she was regularly attending her Alcoholics Anonymous meetings and therapy. He testified that he believed that Robinson mischaracterized his statement to her and that he left multiple phone messages for Robinson in an attempt to correct matters, but that she never returned his calls.

¶ 19    Ana Ramos testified that, since March 24, 2009, she had been plaintiff's substance abuse counselor at NICASA. She testified that plaintiff had perfect attendance at her twice-weekly NICASA sessions. At NICASA, plaintiff was subject to urine tests for alcohol and drugs, and the tests always came back negative. She testified that there was never any indication that plaintiff was actively abusing alcohol. Ramos testified that, although she attempted numerous times to contact Robinson, Robinson never returned her calls.

¶ 20    Magrit Burke testified by telephone that she was plaintiff's Alcoholics Anonymous sponsor and had been for three years. She testified that she was familiar with the symptoms of intoxication. Burke testified that she saw plaintiff "a couple of times each week" and that plaintiff never appeared intoxicated.

¶ 21    Jennifer Perlis-Glassman testified that she was a social worker at M.Q.'s school and spoke to plaintiff approximately once a month. She testified that plaintiff was an involved parent, concerned about M.Q.'s education and well-being. Perlis-Glassman further testified that plaintiff was open with her regarding her alcoholism, treatment, and recovery. Perlis-Glassman testified that, in November and December of 2007, M.Q. told her that she did not feel safe with her mother. Perlis-Glassman believed M.Q. at the time but had never seen any indication that plaintiff was drinking. Perlis-Glassman testified that M.Q. had made false statements to her, which she believed was common with kids.

¶ 22    On August 13, 2009, the ALJ issued his or her recommendations and opinion. The ALJ found that plaintiff was not a credible witness and rejected her contention that she had been sober since 2006. The ALJ recommended that the appeal be denied because DCFS "carried the burden of proof with regard to Allegation #60, Environment Injurious to Health and Welfare." On September 1, 2009, McEwen issued the final DCFS decision, adopting the ALJ's finding and following his or her recommendation.

¶ 23    On October 2, 2009, plaintiff filed a complaint in the trial court, seeking administrative review. DCFS filed the administrative record under seal as its answer to the complaint. Plaintiff filed a memorandum of law in support of her complaint and defendants filed a memorandum in support of the administrative decision.

¶ 24    On June 2, 2010, the trial court held that DCFS's decision was not against the manifest weight of the evidence, that "injurious environment (allegation #60) is a valid allegation of neglect pursuant to [the Abused and Neglected Child Reporting Act]," and that "[t]he hearing was timely filed and within 90 days." Plaintiff timely appealed.

¶ 25    As an initial matter, we note that on July 18, 2011, plaintiff and defendants filed a joint motion to cite additional authorities. The parties ask this court to consider *People v. Burris*, 2011 IL App (1st) 101364, as well as the newly amended version of allegation No. 10/60, which was effective February 8, 2011. See 89 Ill. Adm. Code 300, app. B. We grant the motion.

¶ 26    Plaintiff contends that the indicated finding was improper. In reviewing a final decision under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2008)), we review the administrative agency's decision and not the trial court's determination. *Bolger v. Department of Children & Family Services*, 399 Ill. App. 3d 437, 448 (2010). An agency's decision on a question of law is not binding on a reviewing court and is reviewed *de novo*.

*Id.* Interpretation of agency regulations is a question of law, which we review *de novo. Walk v. Department of Children & Family Services*, 399 Ill. App. 3d 1174, 1181 (2010). However, an agency's interpretation of its own rules and regulations enjoys a presumption of validity. *Id.*

¶ 27     Plaintiff argues that the DCFS rule (allegation No. 10/60) upon which the indicated finding was based exceeds the authority granted to DCFS by its enabling statute. See 20 ILCS 505/4 (West 2008). Defendants counter that the indicated finding is valid because the legislature authorized DCFS to make all rules necessary for the execution of its powers. We agree with plaintiff.

¶ 28     We review *de novo* the question of the validity of allegation No. 10/60. See *Hadley v. Illinois Department of Corrections*, 224 Ill. 2d 365, 370 (2007) (whether an agency rule appropriately implements a statute or conflicts with it raises an issue of law subject to *de novo* review). Although the review is *de novo*, the agency's construction of a statute that it administers and enforces is entitled to substantial weight and deference. *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 387 & n.9 (2010).

¶ 29     The Abused and Neglected Child Reporting Act (Act) (325 ILCS 5/1 *et seq.* (West 2008)) authorizes DCFS to maintain a registry of all persons found to have abused or neglected a child. An entry in the registry is an "indicated finding" and requires certain procedures set out in the Act and the DCFS rules. DCFS maintains a 24-hour hotline number for reports of suspected child abuse or neglect. 89 Ill. Adm. Code 300.30(a) (2011). DCFS must then investigate and determine whether the report of child abuse or neglect is "indicated," "unfounded," or "undetermined." 325 ILCS 5/7.12, 7.14, 3 (West 2008). Indicated reports remain on the registry for a minimum of five years. 325 ILCS 5/7.12 (West 2008). DCFS will indicate a report if it determines that there is "credible evidence" of abuse or neglect. 89 Ill. Adm. Code 300.110(i)(3)(A) (2011). "Credible evidence" means that the available facts, when viewed in light of the surrounding circumstances, would cause a reasonable person to believe that the child was abused or neglected. 89 Ill. Adm. Code 300.20 (2011).

¶ 30     When DCFS determines that a finding should be indicated, the subject of the finding has the right to challenge the finding in a hearing before an ALJ. 89 Ill. Adm. Code 336.60(a) (2011). At the hearing, DCFS has the burden of proving that the indicated finding is supported by a preponderance of the evidence. 89 Ill. Adm. Code 336.100(e) (2011); 89 Ill. Adm. Code 300.20. Following the hearing, the ALJ makes a recommendation to the Director of DCFS, who renders a final administrative decision. 89 Ill. Adm. Code 336.220(a) (2011). All final administrative decisions are subject to judicial review under the Administrative Review Law. 325 ILCS 5/11.6 (West 2008).

¶ 31     This case involves an allegation of neglect. Section 3 of the Act defines a "neglected child" in terms of four circumstances: (1) children who are not receiving care necessary for their well-being, such as medical treatment, food, clothing, or shelter; (2) children who have been abandoned; (3) children who have received crisis intervention services and cannot return home; and (4) infants born with controlled substances in their systems. 325 ILCS 5/3 (West 2008). When the statute took effect on July 1, 1975, "neglect" was defined, in part, as

"subjecting a child to an environment injurious to the child's welfare." Pub. Act 79-65, § 2 (eff. July 1, 1975). In 1980, that phrase was deleted from the Act by Public Act 81-1077 (Pub. Act 81-1077 (eff. July 1, 1980)), due to concerns as to its meaning.

¶ 32    Section 4 of the Children and Family Services Act (DCFS Act) provides that DCFS has the authority "[t]o make all rules necessary for the execution of its powers." 20 ILCS 505/4 (West 2008). Pursuant to this authority, DCFS has promulgated rules for the enforcement and administration of the Act. See 89 Ill. Adm. Code 300.10 through 300.180. Specifically, DCFS promulgated "Appendix B," which describes the specific incidents of harm that must be alleged to have been caused by the acts or omissions identified in section 3 of the Act before DCFS will accept a report of child neglect. 89 Ill. Adm. Code 300, app. B. The allegation definitions, which focus on the harm to the child, have assigned numbers. *Id.* Each neglect allegation is coded with a two-digit number greater than 50.

¶ 33    The allegation at issue here, allegation No. 10/60, is entitled "Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare." *Id.* DCFS identifies a number of actions that fall within its definition of neglect, including exposure of the child to the use of alcohol in the home. *Id.* The factors to be considered to justify indicating a report are the child's age, medical condition, and behavioral, mental, or emotional problems; any developmental or physical disability; the alleged perpetrator's physical, mental, and emotional abilities; and a history of the alleged perpetrator's being indicated for abuse or neglect. *Id.*

¶ 34    In the current matter, plaintiff argues that allegation No. 10/60 impermissibly expands upon section 3 of the Act. Specifically, plaintiff asserts that DCFS did not find that M.Q. was not receiving necessary medical care, food, clothing, or shelter, or that M.Q. was abandoned, had received crisis intervention services, or was born with controlled substances in her system. Instead, DCFS found M.Q. to have been subjected to an "environment injurious," a definition of neglect found only in the DCFS rule under allegation No. 10/60. Plaintiff asserts that allegation No. 10/60 is invalid because DCFS cannot, by rule, expand the legislature's definition of a neglected child.

¶ 35    An administrative agency's authority to adopt rules and regulations is defined and limited by the enabling statute. *Department of Revenue v. Civil Service Comm'n*, 357 Ill. App. 3d 352, 363 (2005). Agency rules cannot extend or alter the scope of the enabling statute, but must conform thereto. *Id.* at 364. Rules that fail to conform to the enabling statute are void *ab initio*. *Id.* at 367. In evaluating whether an agency's rule conforms to the enabling statute, courts look to the legislature's intent. *Illinois RSA No. 3, Inc. v. Department of Central Management Services*, 348 Ill. App. 3d 72, 77 (2004). To the extent that the language is plain, no further inquiry is necessary. *Id.*

¶ 36    Defendants argue that the DCFS rule is consistent with the Act. Administrative regulations have the force and effect of law. *Kean v. Wal-Mart Stores, Inc.*, 235 Ill. 2d 351, 368 (2009). Like statutes, they are presumed valid, and the party challenging them has the burden of showing that they are invalid. *People v. Molnar*, 222 Ill. 2d 495, 508 (2006). An agency has the inherent authority and is given wide latitude and discretion to adopt regulations that are reasonably necessary to perform its statutory duties. *Resource*

*Technology Corp. v. Commonwealth Edison Co.*, 343 Ill. App. 3d 36, 44 (2003). Agency authority extends to that conferred by "fair implication and intendment *** for the purpose of carrying out and accomplishing the objective for which agencies were created." *Briggs v. State*, 323 Ill. App. 3d 612, 617 (2001). An administrative rule is valid if it follows the statute. *Illinois RSA No. 3, Inc.*, 348 Ill. App. 3d at 77. If it can be reasonably done, a court has a duty to affirm the validity of administrative regulations. *Minifee v. Doherty*, 333 Ill. App. 3d 1086, 1088 (2002).

¶ 37     Defendants further argue that allegation No. 10/60's categorization of neglect as a "Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare" is valid because DCFS's authority to promulgate regulations is provided for in the DCFS Act (see 20 ILCS 505/4 (West 2008)) and also referenced by the Act. As the statutory definition of neglect focuses on whether the child is receiving necessary care, allegation No. 10/60 is consistent with the plain language of that definition because the regulatory examples listed by DCFS to further define the allegation all involve situations where a child might not be receiving the care necessary for his or her well-being. According to defendants, the language of the statutory definition is broad and encompasses circumstances such as the "environment injurious" described in allegation No. 10/60. Furthermore, there is nothing in the plain language of the Act that suggests that allegation No. 10/60 is an improper definition of a neglected child.

¶ 38     Defendants also assert that plaintiff's argument negates the need for administrative regulations and is contrary to well-settled legal principles such as that agencies must have wide latitude to adopt regulations that are reasonably necessary to effectuate their statutory functions. See *City of Chicago v. Illinois Labor Relations Board, Local Panel*, 396 Ill. App. 3d 61, 73 (2009) (agencies have the authority to determine, define, and implement statutes through the adoption of rules and regulations). Defendants assert that plaintiff places undue importance on the legislature's removal of the phrase "environment injurious."

¶ 39     In the present matter, although DCFS has the authority to adopt regulations that are reasonably necessary to perform its statutory duties, these regulations are defined and limited by the enabling statute and cannot extend or alter the scope of the enabling statute, but must conform to its confines. See *Department of Revenue*, 357 Ill. App. 3d at 363. Here, the legislature specifically removed the "environment injurious" language from the statute. See *KSAC Corp. v. Recycle Free, Inc.*, 364 Ill. App. 3d 593, 597 (2006). Although agencies enjoy wide latitude to adopt regulations that are reasonably necessary to effectuate their statutory functions (see *City of Chicago*, 396 Ill. App. 3d at 73), they are not at liberty to adopt language that the legislature specifically chose to remove. See *Department of Revenue*, 357 Ill. App. 3d at 364. As it is well established that, when the legislature deletes language, it intends to change the law, allegation No. 10/60 impermissibly expanded upon the enabling statute by including language that the legislature purposely chose to remove.

¶ 40     A comparison between the Act and the Juvenile Court Act of 1987 further convinces us that by deleting "environment injurious," the legislature intended to change the law. The Act is essentially a reporting act. Its central feature is the requirement that all mandated reporters inform DCFS whenever they have "reasonable cause to believe a child known to them in their professional or official capacity may be an abused or neglected child." 325 ILCS 5/4

(West 2008); 89 Ill. Adm. Code 300.30(b)(1) (2011). Failure to report possible abuse or neglect can be charged as a Class A misdemeanor, or even a Class 4 felony for repeated violations, and can also lead to professional disciplinary actions including license revocation. 325 ILCS 5/4 (West 2008); 89 Ill. Adm. Code 300.30(b)(4), (b)(5) (2011).

¶ 41 In light of this mandate, and the penalties for failure to report, it is necessary that the Act's definitions of abuse and neglect be clear enough for mandated reporters to apply. See Richard T. Cozzola, *Towards an Upstream Model of Child Abuse Legislation in Illinois*, 11 Loy. U. Chi. L.J. 251, 258 n.52 (1980) ("the Reporting Act concerns the identification and reporting of suspected instances of child abuse and neglect and, thus, requires very specific standards"). The special concurrence argues that DCFS allows its caseworkers "considerable discretion when determining whether there is a real and significant danger to justify taking a report." *Supra* ¶ 62. We agree with reservation. The basis for our reservation is found in the House Proceedings cited by the special concurrence. The legislature was clearly concerned with what "environment injurious" might be interpreted to mean. The lack of specificity in the phrase "environment injurious" creates shadows wherein fit parents and functional families could suffer debilitating consequences, including the loss of custody, harm to reputation, and needless destruction of stable family units. As this court has recognized, "injurious environment is an amorphous concept that cannot be defined with any specificity." *In re Z.Z.*, 312 Ill. App. 3d 800, 804 (2000). This lack of specificity was the concern that led the legislature to clarify that, for the purposes of the Act, children are not to be considered neglected by virtue of being subjected to an "environment injurious." See 81st Ill. Gen Assem., House Proceedings, June 22, 1979, at 100 (statements of Representative Peters) ("the interpretation of what environment injurious may mean" could cause "a lot of misunderstandings"); 81st Ill. Gen. Assem., Senate Proceedings, May 25, 1979, at 202 (statements of Senator Daley) (amendment made definition "more specific, so people understand what abuse and neglect is"). Furthermore, the legislature deleted the "environment injurious" language at the request of DCFS. 81st Ill. Gen. Assem., Senate Proceedings, July 1, 1979, at 5 (statements of Senator Buzbee) ("This was the child abuse bills. The department had requested some tightening up language in House Amendment 6 and 8 which we accepted.").

¶ 42 The Juvenile Court Act of 1987, in contrast to the Act, specifically provides that a child can be found to be neglected based on an injurious environment. See 705 ILCS 405/2-3(1)(b) (West 2008) ("[t]hose who are neglected include *** a minor under 18 years of age whose environment is injurious to his or her welfare"). However, a neglect proceeding under the Juvenile Court Act, unlike a proceeding under the Act, is a civil, nonadversarial action, the purpose of which is to serve the minor's best interests. *In re J.J.*, 142 Ill. 2d 1, 8 (1991). A broad definition of neglect for the purposes of the Juvenile Court Act allows these courts to take action to help juveniles, without imposing a reporting requirement on mandated reporters, as is the case with the Act. Cozzola, *supra*, at 258 n.52 ("[r]etention of the language in the Juvenile Court Act maintains the broad jurisdictional base which the [Juvenile Court] Act confers on the Juvenile Court").

¶ 43 Here, the omission of "environment injurious" from the neglect definition in the Act makes sense when considered in the context of the reporting requirement that the statute was

enacted to impose. That the legislature continues to allow a finding of neglect based on an injurious environment in the Juvenile Court Act, while having deleted that language from the Act, indicates that the legislature intended different results in the two different contexts. As it is well established that, when the legislature uses certain language in one instance and different language in another, it intends different results; we are further persuaded that the legislature intended that, pursuant to the Act, "environment injurious" should not serve as a basis for a neglect finding. See *Pinilla v. Harza Engineering Co.*, 324 Ill. App. 3d 803, 810 (2001). Thus, we determine that allegation No. 10/60 exceeds the scope of the authority granted by the Act and that it is void *ab initio*. See *Department of Revenue* 357 Ill. App. 3d at 367.

¶ 44    Although the special concurrence suggests that our ruling would have devastating consequences on neglected children in that the ruling would "bind the hands of DCFS caseworkers" and prevent them from properly investigating reports of neglect, we respectfully disagree. The removal of allegation No. 10/60 will not prevent DCFS caseworkers from investigating reports. Under our holding, DCFS caseworkers would continue to investigate all reports of abuse and neglect pursuant to section 7.3 of the Act (325 ILCS 5/7.3 (West 2008)). The critical aspect of our holding, however, allows DCFS to draw from specific allegations and not from a subjective phrase. Under clearly defined allegations, a family is less likely to suffer disruption because a DCFS caseworker subjectively determined that the family's minor children were placed in an "environment injurious." Under our holding, caseworkers remain free to investigate all reports of abuse and neglect, but DCFS would need to indicate perpetrators for abuse or neglect pursuant to one of the numerous allegations that the legislature has not determined to lack the necessary specificity.

¶ 45    Plaintiff's second argument is that the indicated finding was against the manifest weight of the evidence. Plaintiff first asserts that DCFS failed to introduce any competent evidence that M.Q. was neglected on January 29, 2009. We will affirm DCFS's final decision unless its findings were against the manifest weight of the evidence. *Bolger*, 399 Ill. App. 3d at 448.

¶ 46    Plaintiff asserts that the evidence DCFS offered as to the January 29, 2009, incident was inadmissible double hearsay. Specifically, plaintiff asserts that the only evidence was the notes of Cobrda, who did not testify, regarding the out-of-court statements of M.Q. Plaintiff also argues that the notes were offered to show the truth of the matter asserted. Moreover, plaintiff asserts that no reasonably prudent person would rely, without more, on the notes of a person they do not know as to the statements of a nine-year-old child. Defendants respond that the evidence was admissible in the administrative proceeding because it was of the type commonly relied upon by reasonably prudent persons in the conduct of their affairs. Moreover, pursuant to the DCFS rules, the ALJ has the authority to:

> "allow into evidence all evidence helpful in determining whether an alleged perpetrator abused or neglected a child, including oral and written reports, which the [ALJ] and the Director may rely upon to the extent of its probative value, even though not competent under the civil rules of evidence." 89 Ill. Adm. Code 336.120(b)(9) (2011).

Furthermore, pursuant to the DCFS rules, the ALJ has the authority to:

> "allow into evidence previous statements made by the child relating to abuse or neglect

-11-

as hearsay exceptions." 89 Ill. Adm. Code 336.120(b)(10) (2011).

Plaintiff argues that these DCFS rules also impermissibly expand the enabling statute.

¶ 47 DCFS procedures are governed by the Illinois Administrative Procedures Act. 5 ILCS 100/1-1 *et seq.* (West 2008); 20 ILCS 505/4 (West 2008). Under the Administrative Procedures Act, in a contested hearing, "[t]he rules of evidence and privilege as applied in civil cases in the circuit court of this State shall be followed." 5 ILCS 100/10-40(a) (West 2008). Evidence inadmissible under those rules is admissible only "if it is of a type commonly relied upon by reasonably prudent men in the conduct of their affairs." *Id.* In the current matter, we determine that the evidence offered by DCFS was inadmissible.

¶ 48 Here, the record reflects that the ALJ both admitted into evidence and then considered the notes of nontestifying, former DCFS investigator Cobrda. Although, under the Administrative Procedures Act, hearsay is admissible if it is of the type commonly relied upon by reasonably prudent persons in the conduct of their affairs, the hearsay relied upon in this matter does not fit this definition. Here, the out-of-court statements relied upon were from the notes of a former DCFS employee regarding the statements of a nine-year-old child with a history of untruthfulness. Thus, we determine that the evidence regarding the events of January 29, 2009, was inadmissible.

¶ 49 Plaintiff next asserts that DCFS relied upon inadmissible and prejudicial collateral impeachment and bad-acts evidence. Plaintiff asserts that the hearing was "turned into a referendum on whether [plaintiff] had ever slipped in maintaining her sobriety." Plaintiff takes issue with the ALJ's decision to examine and impeach her regarding the events of July 2008 and May 2009. Defendants counter that, because plaintiff testified that she had been sober since 2006, the events of July 2008 and May 2009 were admissible to show that plaintiff's testimony was not credible.

¶ 50 It is well established that collateral impeachment is not allowed in Illinois. *People v. Santos*, 211 Ill. 2d 395, 404 (2004). The test to be applied in determining if a matter is collateral is whether the matter could be introduced for any purpose other than to contradict. *Id.* at 405. A party's prior misconduct is not admissible for the purpose of establishing his or her bad character or propensity to commit illegal or immoral acts. *People v. Hendricks*, 137 Ill. 2d 31, 52 (1990).

¶ 51 In the current matter, we determine that evidence regarding the events of July 2008 and May 2009 was admissible to impeach plaintiff's testimony that she had been sober since 2006. However, the ALJ's reliance on this evidence to find that plaintiff should be indicated for neglect based on the events of January 29, 2009, was error. See *Hendricks*, 137 Ill. 2d at 52. The ALJ was not at liberty to consider evidence of the July 2008 and May 2009 incidents to conclude that plaintiff had the propensity to abuse alcohol and, therefore, must have placed M.Q. in an injurious environment on January 29, 2009. *Id.* Furthermore, as both the July 2008 and the May 2009 incidents were deemed unfounded by DCFS, the ALJ could not now rely on these incidents to determine that, on January 29, 2009, plaintiff placed M.Q. in an environment that was injurious to the child's health and welfare. See 89 Ill. Adm. Code 300, app. B, No. 10/60.

¶ 52 Based on our review of the record, we determine that the indicated finding was against

the manifest weight of the evidence. Plaintiff was indicated for neglect based on the alleged conduct of January 29, 2009. However, the only witness with personal knowledge of the events of that day was plaintiff. Plaintiff testified that she did not consume alcohol on that day and did not lock M.Q. in her room. All parties agree that on January 29, 2009, plaintiff did not lock M.Q. in her room, as M.Q.'s door did not possess a lock. Robinson admitted that she was not present during the alleged incident, and that the only person who told her that plaintiff had been drinking alcohol on January 29, 2009, was M.Q., whom she had met only once, on February 18, 2009, and who, other witnesses testified, had a history of untruthfulness. Robinson admitted that she decided to indicate plaintiff for neglect based on information she obtained after reading the notes from Cobrda, whom she had never met and who did not testify. The record reflects that the ALJ both admitted into evidence and considered Cobrda's notes. Although, under the Administrative Procedures Act, hearsay is admissible if it is of the type commonly relied upon by reasonably prudent persons in the conduct of their affairs, the hearsay relied upon in this matter does not fit this definition.

¶ 53    The remaining testimony against plaintiff revolved around other alleged incidents at plaintiff's home, none of which occurred on or around January 29, 2009. Moreover, each of these alleged incidents had previously been investigated by DCFS and deemed "unfounded." Furthermore, the record reflects that the ALJ relied upon testimony regarding the incidents to show the truth of the matter asserted. See *Hendricks*, 137 Ill. 2d at 52. The record reflects that there was no admissible evidence that plaintiff neglected M.Q. by placing her in an injurious environment on the evening of January 29, 2009. Thus, we determine that the indicated finding was against the manifest weight of the evidence and must be vacated.

¶ 54    Because we reverse the trial court's determination that the indicated finding was not against the manifest weight of the evidence, we need not address the issue of timeliness.

¶ 55    For the reasons stated, we reverse the decision of the circuit court of Lake County and vacate DCFS's indicated finding.

¶ 56    Vacated and reversed.

¶ 57    JUSTICE BIRKETT, specially concurring.

¶ 58    Although I concur in the majority's ruling that the indicated finding here was against the manifest weight of the evidence, I disagree that allegation No. 10/60 exceeds the scope of the authority granted by the Act and that it is therefore void *ab initio*. In its ruling, the majority characterizes plaintiff's contention as arguing that, because DCFS did not find that M.Q. was not receiving necessary medical care, food, clothing, or shelter, or that she was abandoned, had received crisis intervention services, or was born with controlled substances in her system, plaintiff could not be the subject of an indicated finding under the Act. The majority then holds that DCFS erred as a matter of law when it found M.Q. to be a neglected child on the basis of being placed in an "environment injurious," because that definition of neglect is found only in the DCFS rules under allegation No. 10/60, and allegation No. 10/60 impermissibly expanded the legislature's definition of a neglected child.

¶ 59    I must initially point out that section 3 of the Act does not define a "neglected child" only

-13-

in terms of the four circumstances. The definition of a "neglected child" in section 3 of the Act provides, in pertinent part:

> " 'Neglected child' means any child who is not receiving the proper or necessary nourishment or medically indicated treatment including food or care not provided solely on the basis of the present or anticipated mental or physical impairment as determined by a physician acting alone or in consultation with other physicians or otherwise is not receiving the proper or necessary support or medical or other remedial care recognized under State law as necessary for a child's well-being, *or other care necessary for his or her well-being*, including adequate food, clothing and shelter; or who is abandoned by his or her parents or other person responsible for the child's welfare without a proper plan of care; or who has been provided with interim crisis intervention services under Section 3-5 of the Juvenile Court Act of 1987 and whose parent, guardian, or custodian refuses to permit the child to return home and no other living arrangement agreeable to the parent, guardian or custodian can be made, and the parent, guardian or custodian has not made any other appropriate living arrangement for the child; or who is a newborn infant whose blood, urine, or meconium contains any amount of a controlled substance as defined in subsection (f) of Section 102 of the Illinois Controlled Substances Act or a metabolite thereof ***." (Emphasis added.) 325 ILCS 5/3 (West 2008).

A careful reading of the Act demonstrates that, along with the four circumstances listed, the definition of a "neglected child" also includes any child who is not receiving "other care necessary for his or her well-being." 325 ILCS 5/3 (West 2008). Clearly, then, the legislature did not intend to limit the definition to children who fall into these four categories alone.

¶ 60 Based on the Act's definitions of abuse and neglect, DCFS promulgated regulations describing "specific incidents of harm" that must be alleged in a report of abuse or neglect. See 89 Ill. Adm. Code 300, app. B. Basically, these allegations define problematic conduct. *Slater v. Department of Children & Family Services*, 2011 IL App (1st) 102914, ¶ 25. Some of these allegations do not fall into the four categories but instead fall under the category of "other care necessary for [a child's] well-being." See 325 ILCS 5/3 (West 2008). For example, allegation No. 17/67, "Mental and Emotional Impairment," which is defined as "injury to the intellectual, emotional or psychological development of a child as evidenced by observable and substantial impairment in the child's ability to function within a normal range of performance and behavior, with regard to his or her culture," and allegation No. 74, "Inadequate Supervision," which is defined as when a child "has been placed in a situation or circumstances that are likely to require judgment or actions greater than the child's level of maturity, physical condition, and/or mental abilities would reasonably dictate." 89 Ill. Adm. Code 300, app. B.

¶ 61 Here, the allegation of harm at issue is entitled, "Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare." This neglect allegation is defined as "placing a child in an environment that is injurious to the child's health and welfare *** (neglect)." 89 Ill. Adm. Code 300, app. B. Examples of circumstances that support such an allegation include the following: "[d]omestic violence in the home when the child has been threatened and the threat is believable, as evidenced by a past history of violence or uncontrolled behavior"; "[t]he circumstances surrounding the death of one child provides

-14-

reason to believe that another child is at real and significant danger of [physical injury]”; “[a]nyone in the home exposes child to an environment that significantly affects the health and safety based on use, sale or manufacturing of illegal drugs or alcohol”; “[p]arent’s or caretaker’s mental illness and behavior poses a significant danger to the child’s health and safety”; and “parent has been adjudicated unfit by a court and the parent has not completed services that would correct the conditions which led to the court finding.” 89 Ill. Adm. Code 300, app. B.

¶ 62    Although the Act is a mandatory reporting statute, allegation No. 10/60 gives the DCFS caseworker considerable discretion when determining whether there is a real and significant danger to justify taking a report. Those factors include: (1) the child’s age; (2) the child’s medical condition; (3) the severity of the occurrence; (4) the frequency of the occurrence; (5) the alleged perpetrator’s physical, mental, and/or emotional abilities; (6) the dynamics of the relationship between the alleged perpetrator and the child; and (7) the alleged perpetrator’s access to the child. All of these factors need not be present to justify taking the report. 89 Ill. Adm. Code 300, app. B.

¶ 63    Here, the majority agrees that DCFS has the authority to adopt regulations that are reasonably necessary to perform its statutory duties. However, it points out that an administrative body cannot extend or alter the scope of the enabling statute by the exercise of its rulemaking powers. *Department of Revenue*, 357 Ill. App. 3d at 364. While this is true, simply because the legislature removed the term “environment injurious” from the Act over 30 years ago does not mean that this removal prohibited DCFS from creating allegation No. 10/60.

¶ 64    A review of the legislative history that the majority cites to only supports the conclusion that the removal of “environment injurious” from the Act in 1980 did not strip DCFS of its authority to enact allegation No. 10/60. As the majority points out, the Act is essentially a reporting act. The failure to report possible abuse or neglect can be charged as a Class A misdemeanor or a Class 4 felony for repeated violations, and it can also lead to professional disciplinary actions, including license revocation. 325 ILCS 5/4 (West 2008). Therefore, it is only logical that DCFS would want the term “environment injurious,” without any further explanation, removed from the statutory definition of a “neglected child” under the Act. In fact, the legislative history confirms that the removal of this term was at DCFS’s request. See 81st Ill. Gen. Assem., Senate Proceedings, July 1, 1979, at 5 (statements of Senator Buzbee) (“This was the child abuse bills. The department has requested some tightening up language in House Amendment 6 and 8 which we accepted.”). Moreover, Representative Peters, one of the sponsors of the bill that deleted the “environment injurious” term from the statute, did not claim that the term was not a proper definition of neglect. Instead, he was concerned only that there would be confusion and litigation over the term’s meaning. See 81st Ill. Gen. Assem., House Proceedings, June 22, 1979, at 100 (statements of Representative Peters). Specifically, he stated:

“What amendment #8 would do is to remove from the definition of neglected child the words ‘subjected to an environment injurious to his or her welfare’ and the reasons we are removing that is the concern over the interpretation of what environment injurious may mean. We are fearful that it may end up in a lot of litigation, a lot of

-15-

misunderstandings and until such time that we can arrive at a more clearer [*sic*], concise kind of definition to address this kind of problem, we think it's better to remove this from the Bill."

¶ 65 In promulgating allegation No. 10/60, DCFS did not merely provide that the term alone defined neglect. Rather, it provided in detail the meaning of the allegation by listing numerous explanations, examples of incidents or circumstances, and factors to be considered to justify taking a report of abuse or neglect. 89 Ill. Adm. Code 300, app. B. By defining this term in such detail, DCFS removed any confusion as to its meaning. Further, all the details in allegation No. 10/60 are consistent with the definition of neglect in the Act, which specifically mentions care necessary for a child's well-being. See 325 ILCS 5/3 (West 2008). Therefore, allegation No. 10/60 does not conflict with the Act; instead, it implements it. See 325 ILCS 5/3 (West 2008).

¶ 66 Finding allegation No. 10/60 void *ab initio*, and thereby creating a vacuum by the removal of these specific incidents of harm, will thwart the legislature's intent to require DCFS to protect the health, safety, and best interests of the child in all situations where a child is vulnerable to child abuse or neglect, as directed in section 2 of the Act. See 325 ILCS 5/2 (West 2008). An example of this type of harm was presented in the instant case. Although we have found that the indicated finding of neglect was against the manifest weight of the evidence here, a caseworker should nevertheless have the ability to respond to a hotline call that a parent is consuming alcohol to the extent that it is causing an injurious environment for a child or children residing in that parent's home. This is the exact type of harm that the Act is supposed to protect against. The two purposes of the Act are to protect: (1) any abused or neglected child; and (2) any person erroneously accused of such abuse or neglect. See *Kemp-Golden v. Department of Children & Family Services*, 281 Ill. App. 3d 869, 874 (1996). If a DCFS caseworker cannot respond to a hotline tip that a child is residing with a parent who is drinking to the extent that the child's living environment is injurious, the primary purpose of the Act is being completely ignored.

¶ 67 This ruling will have devastating consequences on neglected children in Illinois. It will serve to bind the hands of DCFS caseworkers, whose duty it is to investigate incidents of neglect and protect children from its destructive consequences. If a caseworker cannot investigate a reported case of neglect that falls into the category of "environment injurious" under allegation No. 10/60, then no further action can be taken. Those same DCFS caseworkers will not be able to use any evidence garnered from an investigation pursuant to the Act to, in many cases, pursue further proceedings under the Juvenile Court Act to protect the neglected child. See 705 ILCS 405/1-1 *et seq.* (West 2008). An example of such illogical results can be found by reviewing the facts of *In re J.W.*, 289 Ill. App. 3d 613 (1997). In that case, a woman gave birth in an intoxicated state. The child, J.W., was referred to social services because he was born prematurely with a low birth weight due to the mother's probable alcoholism and smoking during her pregnancy. The State then filed a petition for adjudication of wardship, alleging that J.W. was neglected under the Juvenile Court Act because he was a minor whose environment was injurious to his welfare. *J.W.*, 289 Ill. App. 3d at 615. The trial court found that J.W. was a neglected minor, and the appellate court affirmed, holding that evidence of a mother's drinking during her pregnancy was relevant to

the issue of whether the mother had a drinking problem that made the child's environment after birth injurious. *J.W.*, 289 Ill. App. 3d at 617-18. The same considerations that applied in *J.W.* apply with equal force to a situation where a mandatory reporter has knowledge that a parent's drinking might be creating an environment injurious for her child. The majority's determination that allegation No. 10/60 is void *ab initio* simply because the legislature removed the term "environment injurious" from the Act 30 years ago elevates form over substance and will cause scores of neglected children to go unprotected in direct contradiction of the primary purpose of the Act. See 325 ILCS 5/2 (West 2008). For all these reasons, I strongly disagree with the majority's ruling that allegation No. 10/60 is void *ab initio*.