2025 IL App (4th) 240049

NO. 4-24-0049

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 12, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| SHAWN WRIGHT, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Peoria County |
| THE DEPARTMENT OF CHILDREN AND FAMILY | ) | No. 23MR78 |
| SERVICES and MARC SMITH, In His Official Capacity | ) | |
| as Director of Children and Family Services, | ) | Honorable |
|     Defendants-Appellants. | ) | Lisa Yvette Wilson, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Doherty and Lannerd concurred in the judgment and opinion.
Justice Doherty also specially concurred, with opinion.

**OPINION**

¶ 1      Defendants, the Department of Children and Family Services (DCFS) and its director, Marc Smith (Director), appeal from an order of the circuit court of Peoria County reversing DCFS's final administrative decision denying the request of plaintiff, Shawn Wright, to expunge an indicated finding of sexual exploitation against him under the Abused and Neglected Child Reporting Act (Act) (325 ILCS 5/1 *et seq.* (West 2022)). On appeal, DCFS argues the court erred by concluding (1) the Director's finding that Wright sexually exploited E.B., a minor, was against the manifest weight of the evidence, (2) the Director improperly considered hearsay evidence of E.B.'s statements, and (3) DCFS's investigation failed to comply with the relevant statutory timing requirements. We disagree and affirm the judgment of the trial court.

¶ 2                      I. BACKGROUND

¶ 3                    A. The Initial Hotline Report

¶ 4         On March 4, 2022, DCFS received a hotline report concerning an incident involving Wright, a coach and teacher's aide at Manual High School in Peoria, Illinois, and E.B., a 17-year-old senior student. According to the report, E.B. disclosed she and Wright were in a stairwell alone when Wright asked her, "How come you don't where [*sic*] a bra?" Wright "then pulled her breast out of her shirt" and told her, "You're too young. I'm just messing around, but if you were older, I would hit that." Wright then grabbed E.B.'s buttocks.

¶ 5                    B. The DCFS Investigation

¶ 6         Following the hotline report, Wright was placed on administrative leave. Detective Adrian Aguilar of the Peoria Police Department was assigned to the criminal investigation of the incident. Valerie Johnson was assigned to DCFS's investigation, which assessed whether to make an indicated finding against Wright for "Allegation of Harm No. 20," sexual exploitation, and "Allegation of Harm No. 21," sexual molestation. Johnson's investigative file contained the following information.

¶ 7                    1. *Johnson's Interview of T.S.*

¶ 8         On March 4, 2022, Johnson traveled to the home of T.S., E.B.'s friend. Johnson intended to speak with E.B., who had been residing at T.S.'s home since October 2021. When Johnson arrived, T.S.'s mother answered the door and informed Johnson that E.B. was not present. As a result, Johnson spoke with T.S.'s mother, who stated E.B. was a good student and was enlisted in the United States Army with a ship-out date of May 1, 2022. E.B. began staying with her and T.S. after E.B. reported she and her grandmother, who had been caring for her, were not getting along. T.S.'s mother explained that on March 1, 2022, E.B. disclosed to T.S. "someone had been inappropriate" with her at school. After T.S. told her mother about E.B.'s disclosure, she, T.S., and

E.B. met with the school's principal on March 3, 2022.

¶ 9                                    2. *E.B.'s Written Statement*

¶ 10          Johnson's investigative file included a statement E.B. wrote on March 3, 2022, in which she reported that on March 1, 2022, Wright stopped her while she was walking to the nurse's office, gave her a hug, and asked when she was leaving for the Army. Wright then said, "[L]et me ask you something? Why don't you ever wear a bra?" E.B. responded, "I don't know their [*sic*] just uncomfortable." Wright stated, "[T]hey are nice though they are nice," then again asked her about the Army.

¶ 11          Thereafter, Wright walked into the stairwell "and told [E.B.] to come here because he doesn't want anybody to think no weird stuff." Wright "asked to see [E.B.'s] nipples when [she] walked over." E.B. wrote that Wright said he was serious, told her again, "[L]et me see your nipples" and "pulled my whole breast out my shirt." Wright then said he was "just playing with you your to young but If you were old enough Id most definitely hit that [*sic*]." As E.B. left the stairway, Wright "hit [her] behind" then followed her toward the nurse's office while talking about the Army and stating he was "just playing back there."

¶ 12          Three minutes after E.B. entered the nurse's office, Wright walked in, talked with E.B. about the Army again, then left. E.B. left the nurse's office about five minutes later, and Wright stopped her saying, "I was just playing you know your to [*sic*] young I would never[.] I was just joking with you so don't take it serious." E.B. responded, "Okay," and then walked away.

¶ 13                                    3. *Aguilar's Interview of E.B.*

¶ 14          Johnson's file also documented that Aguilar arranged for a Children's Advocacy Center (CAC) interview with E.B. to occur on March 8, 2022. Aguilar conducted the interview, which was recorded and later reviewed by Johnson. Johnson compiled a summary of the interview

for the investigative file. According to Johnson's summary, E.B. told Aguilar on March 1, 2022, she was walking to the nurse's office when Wright stopped her in the hallway. It was not unusual for Wright to hug her, and they often talked about her enlistment in the military because Wright also served in the military. After Wright asked about E.B.'s ship-out date, he went into the stairwell near his classroom and said, " '[L]et me ask you something.' " E.B. followed Wright into the stairwell, and Wright "asked her why she doesn't wear a bra." E.B. told him, "[T]hey are not comfortable," and Wright stated, "[T]hey still look nice."

¶ 15        E.B. told Aguilar that Wright then asked to "see her nipples," and she told him "no." According to E.B., Wright then reached out and pulled the front of her tank top down with his finger, exposing one of her breasts. E.B. noted Wright did not physically touch her when pulling down her shirt. E.B. backed up and started to leave the stairwell. As she did so, Wright patted her buttocks and told her he was "just playing," as "she was too young for him," but if she was older, he would "hit that."

¶ 16        E.B. went to the nurse's office, and after she was there for two or three minutes, Wright also arrived. According to E.B., they again discussed the Army, then Wright left. When E.B. left the nurse's office, Wright was in the hall. Wright told her he was "joking with her," she was "too young for him," and she did not need to tell anyone about what happened because he was "just playing." Thereafter, E.B. walked away and texted T.S. about what happened. E.B. told Aguilar she had known Wright for four years and he had never before been inappropriate with her.

¶ 17               4. *Johnson's Conversation With Aguilar*

¶ 18        The investigative file also indicated Johnson spoke with Aguilar on March 10, 2022, and he told her that he had viewed video footage from Manual High School that captured parts of E.B. and Wright's interactions in the hallways, although no cameras were in the stairwell

itself. Aguilar informed Johnson he intended to contact Wright to schedule an interview with him and he would let Johnson know when it was scheduled.

¶ 19 However, on March 15, 2022, Aguilar informed Johnson he forgot to contact her to tell her he had spoken with Wright at the police station. Aguilar told Johnson that Wright had denied the allegations against him, explaining that E.B. followed him into the stairwell to show him a new tattoo on her shoulder. Wright also told him he did not know E.B.'s name, and he denied speaking with E.B. after encountering her at the nurse's office. Wright made "statements about a bell ringing," but according to Aguilar, "his story was inconsistent with body language *** on video footage of their interactions." By contrast, Aguilar believed E.B.'s story was consistent with the video footage he reviewed. Aguilar informed Johnson that Wright was arrested for aggravated battery due to the incident but the State ultimately declined to file charges against him.

¶ 20                                 5. *Aguilar's Police Report*

¶ 21 Johnson's investigation experienced several delays from March 15, 2022, through September 2022—during which time E.B. turned 18. Notes in the investigative file provided that, although Johnson believed the "report will be indicated," the investigation would "have to go into extension" due to, among other things, Johnson's not being able to obtain a police report from Aguilar, her needing to interview Wright, and her otherwise having "multiple tasks to complete."

¶ 22 After receiving the police report of the incident, Johnson included a summary in the investigative file. According to Johnson, the police report contained the following information. E.B. alleged that "Wright pull [*sic*] her breast from out of her shirt against her will" while in a stairwell. The report also described the events as asserted by E.B. in her March 3, 2022, written statement. Wright, however, denied the allegations, claiming he walked into the stairwell when E.B. "mentioned she had a tattoo and showed him the tattoo." He then returned to his classroom

before going to the nurse's office for a bandage.

¶ 23    The police interviewed the school principal, who stated she felt Wright's claim that E.B. wanted to show off her tattoo, which depicted a large "Manual Ram" on her shoulder, "was credible." The principal explained E.B. frequently showed her tattoo to other teachers by "pulling her shirt to the side to expose it" and that E.B. was "not bashful about showing her tattoo." Thereafter, the police interviewed E.B.'s grandmother, who explained she was recently diagnosed with stage three liver failure. E.B.'s grandmother told officers that she and E.B. "clashed" because E.B. "wanted more space and freedom." As a result, the grandmother agreed to let E.B. live with T.S. and T.S.'s mother "to make things easier for all of them."

¶ 24    6. *Johnson's Interview of Wright*

¶ 25    On September 27, 2022, Johnson spoke with Wright. Wright told her he only generally knew E.B. by her face and did not know her name. He talked with E.B. regularly about the military, given her goals and his prior military service. He explained it was common in the 30 years he worked in the school district to talk to students, encourage them, and give them hugs and high fives to support them and promote healthy relationships with authority figures.

¶ 26    Wright told Johnson that on March 1, 2022, he saw E.B. while walking out of his classroom. He gave her a "side hug" and talked about the Army and her lack of a driver's license. According to Wright, he told E.B. he was going upstairs and turned to the stairwell. However, E.B. stopped him, said she got a new tattoo, and asked if he wanted to see it. Wright replied, "[S]ure." E.B. came into the stairwell with him, pulled down the shoulder of her tank top, and displayed a tattoo of the school's mascot—a Manual Ram—on her upper arm and shoulder. Wright stated the rest of E.B.'s torso, including her breasts, remained covered and he made no contact with her. He then "believe[d] the bell then rang," so he went back into the hall to return to his class. A short

time later, he went to the nurse's office for a hangnail, and he saw E.B. there, who told him her medication was upsetting her stomach. Wright told her to feel better, then he went back to his class.

¶ 27 Wright did not recall speaking with E.B. thereafter, but the police told him he had. He saw E.B. in the hallways later in the day, but she did not seem afraid of him. He explained he was called into the school office a few days later and was asked if an incident occurred between him and a student. He responded, "[N]o." He told Johnson he learned the stairwell he and E.B. were in was the only stairwell in the school without a security camera in it when he asked for the video footage of the alleged incident. He denied touching E.B. or asking her about her breasts.

¶ 28                                  7. *Johnson's Final Report*

¶ 29 On October 5, 2022, Johnson completed her report, which proposed an indicated finding for "Allegation of Harm No. 20," sexual exploitation, and that "Allegation of Harm No. 21," sexual molestation, was unfounded. An administrator's conference was scheduled for November 3, 2022. See 325 ILCS 5/7.4(c)(1) (West 2022) (granting school employees suspected of abuse or neglect the right to an administrator's teleconference prior to a final finding wherein the alleged perpetrator may present evidence or information supporting his or her position). On that date, Wright did not call in to the conference, and at its conclusion, the administrator upheld the proposed indicated finding of sexual exploitation. On November 4, 2022, DCFS indicated Wright for the allegation of sexual exploitation.

¶ 30                                  C. Administrative Appeal

¶ 31 On November 14, 2022, Wright requested an administrative appeal. At the prehearing conference, DCFS disclosed that it intended to call Johnson, Johnson's supervisor, and Aguilar as witnesses. DCFS also disclosed E.B. as a witness but indicated it had "no realistic hopes

of actually obtaining her testimony" because she had turned 18 and joined the Army. The hearing was scheduled for December 20, 2022.

¶ 32    On December 20, 2022, DCFS sought a continuance on the basis that Aguilar was ill. In response, Wright's counsel objected to a continuance, asserting that "these investigations are taken—are usually completed in about 60 days. This was seven months." The administrative law judge (ALJ) granted DCFS a continuance over Wright's objection and set the hearing for January 25, 2023.

¶ 33    The hearing commenced on January 25, 2023.

¶ 34                    1. *Aguilar's Testimony*

¶ 35    DCFS first called Aguilar, who recounted what E.B. told him during her forensic interview. Aguilar further described a gesture E.B. made during the interview when describing how Wright purportedly exposed her breast. Specifically, E.B. demonstrated that Wright had reached out with a finger and pulled down her shirt to expose her breast. She claimed Wright "did not actually touch her breasts" but had pulled down her shirt and exposed her breast.

¶ 36    Aguilar also described hallway surveillance videos that had been recovered. The videos contain no sound, and on multiple occasions, several frames of each video appear to be missing, suggesting interruptions in the recordings. Aguilar testified the cameras record only when they detect motion and stop recording when no motion is detected. Those videos were played for the ALJ.

¶ 37    The videos show three different angles of school hallways. In one video, Wright is seen giving E.B. a hug with one arm while three other individuals enter or exit the frame. After standing near each other for several seconds, Wright leaves the view of the surveillance camera. E.B. also leaves the view of the surveillance camera immediately after and in the same direction

as Wright. E.B. then reenters the hallway followed by Wright. They appear to speak to each other, during which they give each other a "fist bump," and they eventually leave the frame again.

¶ 38        Wright appears to enter and leave the frame multiple times before entering one more time and standing against the wall on the far end of the hallway. E.B. reenters the frame and crosses the hallway toward a doorway to another wing of the school. As she does so, Wright and E.B. appear to see each other. After E.B. crosses the threshold to the other wing, she abruptly turns around to return to the hallway while Wright simultaneously walks toward E.B. They meet in the middle of the hallway and appear to have a brief conversation before they walk away from each other.

¶ 39        Additionally, Aguilar recounted his interview with Wright and testified the videos corroborated E.B.'s statements more than Wright's. Aguilar explained Wright had told him he and E.B. went into the stairwell because E.B. wanted to show him her tattoo and, afterwards, he was going to meet a faculty member on the second floor. However, that did not occur because he "went to the nurse to get a Band-Aid for a hangnail." Aguilar acknowledged he did not interview any of the other individuals who were near the scene.

¶ 40        Aguilar further testified that during his investigation, there was "nothing I could find in her background from any of the administrators at the school" suggesting she had anything against Wright. Aguilar testified this was significant because he "often" found in similar cases that the juvenile "sometimes has something against or something motivating them basically, to make this type of allegation."

¶ 41        On cross-examination, Aguilar acknowledged E.B. and Wright were in the stairway for six or seven seconds and after reentering the hallway, E.B. walked back toward Wright to engage in conversation with him and exchange a "fist bump" with him.

¶ 42 Following Aguilar's testimony, DCFS informed the ALJ it was unable to obtain the video of Aguilar's forensic interview of E.B. in time to disclose it for the hearing.

¶ 43                                    2. *Johnson's Testimony*

¶ 44 Johnson testified she was a child protection specialist for DCFS and was assigned to the report involving E.B. She learned the police were also investigating the incident shortly after it was assigned to her. According to Johnson, it was her experience that, when the police conducted a criminal investigation of the same incident that was the subject of a hotline report, the criminal investigation took precedence. She agreed that in those cases, DCFS takes a "hands off" approach while the police perform the investigation and police reports are collected from the investigating officer. Accordingly, in conducting DCFS's investigation, Johnson collected and summarized Aguilar's police report of the incident, reviewed E.B.'s forensic interview, viewed the school surveillance video footage, and interviewed Wright. She confirmed she did not personally interview E.B. Johnson explained Wright's indicated finding came after determining E.B.'s statements to school staff and to Aguilar during her forensic interview were "consistent throughout," while Wright's statements "were inconsistent and also not entirely consistent with the camera footage."

¶ 45 The ALJ admitted DCFS's investigative file over Wright's objection that portions of the file contained irrelevant and prejudicial information relating to unfounded reports.

¶ 46                                    3. *Wright's Testimony*

¶ 47 Wright testified he knew E.B. from "around school" and would talk with her about "going into the military," but he did not learn her name until after the investigation began. According to Wright, on March 1, 2022, he saw E.B. and hugged her, which was a common practice for school employees. Following a conversation with her, he entered the stairwell to leave,

but E.B. said she had a tattoo. Wright said, "[W]ell, let me see it," and was about to exit the stairwell when E.B. stepped in. E.B. then "pulled the little thing over and she showed [him] the tattoo," and Wright said, "[T]hat's really nice." Wright asked, "[W]ho did it," and E.B. responded, "[S]ome guy." They exited the stairway and joked with each other before Wright went back to his classroom to check on students.

¶ 48    After doing so, Wright let the teacher know he was going to get a bandage for a hangnail and then went to the nursing station. When he arrived, he saw E.B. there, and he asked her, "[W]hat's wrong with you?" E.B. responded that medicine she was taking was upsetting her stomach. He told E.B. to "get better" and then left for his classroom.

¶ 49    Upon receiving a phone call, Wright went into the hallway and was talking on the phone when he saw E.B. walking by. E.B. told Wright she was feeling better, and Wright went back to class.

¶ 50    Wright denied touching E.B., pulling at her spaghetti strap, seeing her breasts, and telling her he would "hit that." According to Wright, he had "no idea" why E.B. made these accusations against him, but he felt "sorry for her because there is something that happened that made her do this."

¶ 51    4. *Closing Arguments*

¶ 52    During its closing argument, DCFS acknowledged that the ALJ's decision was "going to be a lot tougher without the benefit of viewing the CAC interview and hearing this from the victim's mouth." Even so, it did not believe "any good reason" was given as to why E.B. would have fabricated her allegation. Wright, however, argued E.B.'s statements were inconsistent because she apparently told some individuals that Wright pulled her breast out of her shirt but told others Wright pulled her shirt down. Wright further argued that although he was not required to

prove why E.B. might have fabricated the allegations, the evidence showed E.B. did so as a way of getting attention.

¶ 53                                    5. *The ALJ's Findings*

¶ 54            In February 2023, the ALJ issued its order recommending the denial of Wright's request to expunge the indicated report for sexual exploitation against him. The ALJ acknowledged it was a "close case" because (1) the incident was not captured on video, (2) Wright denied E.B.'s allegations, and (3) there was evidence E.B. showed many people her tattoo. The ALJ further noted it was "difficult" to assess E.B.'s credibility because her forensic interview was not entered into evidence. Even so, the ALJ concluded E.B.'s disclosure "was credible" because she immediately disclosed the encounter to T.S. Additionally, E.B.'s "disclosures were consistent with each other and with the footage recovered from the high school's surveillance cameras," although the ALJ acknowledged "the cameras did not capture what happened in the stairwell."

¶ 55            By contrast, the ALJ found Wright's statements "did not have the same coherence" because he claimed "he'd gone into the stairwell to go upstairs, but that is not what he did." Instead, he exited the stairwell with E.B. because he claimed the bell rang. However, the ALJ noted, "[I]t is clear from the surveillance video that no bell rang." Moreover, Wright "was not able to suggest any reason [E.B.] might have had to fabricate the incident." Accordingly, the ALJ concluded that (1) E.B.'s version was more credible and (2) the indicated finding against Wright for sexual exploitation was supported by a preponderance of the evidence.

¶ 56                                    D. Judicial Review

¶ 57            In March 2023, Wright filed a complaint for judicial review in the circuit court requesting reversal of DCFS's decision. See 735 ILCS 5/art. III (West 2022); 325 ILCS 5/11.6 (2022). Wright contended DCFS violated his due process rights by failing to complete its

investigation within the time frames established by statute and administrative rules. Wright further argued DCFS's case relied upon improper hearsay from E.B., and therefore, DCFS's decision was against the manifest weight of the evidence and violated his due process rights.

¶ 58        In response, DCFS claimed its decision was not against the manifest weight of the evidence because E.B.'s statements were properly admitted under DCFS's administrative rules. Additionally, DCFS asserted Wright's due process rights were not violated because it was permitted to obtain extensions of time to complete its investigation.

¶ 59        In December 2023, the circuit court reversed DCFS's decision and granted Wright's request to expunge the indicated finding against him. The court concluded that DCFS's case was based upon hearsay because the evidence was simply what Aguilar testified E.B. had told him. The court further noted the investigative report admitted over Wright's objection "was essentially statements that were provided by [E.B.]" and E.B. did not herself testify. Accordingly, because (1) Wright provided direct testimony denying wrongdoing and (2) E.B.'s own hearsay statements contained inconsistencies about what occurred, the ALJ's decision was against the manifest weight of the evidence.

¶ 60        This appeal followed.

¶ 61                            II. ANALYSIS

¶ 62        On appeal, DCFS argues the circuit court erred by reversing DCFS's final decision and granting Wright's request for expunction because (1) its decision was not against the manifest weight of the evidence or clearly erroneous; (2) Wright forfeited his challenge to E.B.'s hearsay testimony, which DCFS was free to consider; and (3) DCFS's investigation complied with the relevant statutory and administrative timing requirements.

¶ 63        Wright counters that (1) DCFS's failure to complete its investigation within statutory time limits deprived it of jurisdiction over the matter, (2) DCFS's finding was against the manifest weight of the evidence, and (3) his due process rights were violated by both DCFS's investigatory delays and the ALJ's consideration of E.B.'s hearsay testimony. Additionally, Wright asserts he did not forfeit these arguments.

¶ 64        In response to Wright's jurisdictional argument, DCFS contends the relevant timing requirements were merely directory, such that DCFS maintained jurisdiction over the matter.

¶ 65                    A. The Burden of Proof and Standard of Review

¶ 66                        1. *The Burden of Proof*

¶ 67        In *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 268 (2004), a case procedurally similar to the present one, Lyon was employed as a choral director at a high school. After DCFS conducted an investigation into a report that he had abused two students, DCFS determined that the report of abuse was indicated. *Id.*

¶ 68        Lyon sought reversal of the indicated report through the administrative appellate process (*id.* at 266), as did Wright in the present case. In *Lyon*, the supreme court, when describing that administrative appellate hearing, wrote the following:

> "At the hearing on appeal, the Department has the burden of proving that the indicated finding is supported by a preponderance of the evidence. 89 Ill. Adm. Code § 336.100(e) (2002); see 325 ILCS 5/7.16 (West 1998). 'Preponderance of the evidence' is defined as 'the greater weight of the evidence or evidence which renders a fact more likely than not.' 89 Ill. Adm. Code § 336.20 (2002)." *Id.* at 279.

¶ 69                        2. *The Standard of Review*

¶ 70    The Act provides that all final administrative decisions of DCFS are subject to judicial review under the Administrative Review Law (735 ILCS 5/art. III (West 2022)). 325 ILCS 5/11.6 (West 2022). When considering an appeal from a judgment in an administrative review proceeding, we review the administrative agency's decision, not that of the circuit court, and we "will reverse where the agency's decision is legally erroneous." *City of East Peoria v. Board of Trustees of the Police Pension Fund of East Peoria*, 2023 IL App (4th) 220816, ¶ 13. "Review extends to all questions of law and fact presented by the record." *Western Illinois University v. Illinois Educational Labor Relations Board*, 2021 IL 126082, ¶ 30.

¶ 71    The standard of review to be applied is dictated by the question presented on appeal. *Leone v. Department of Financial & Professional Regulation*, 2024 IL App (4th) 220753, ¶ 60. We review questions of law *de novo*. *Id.* However, DCFS's findings of fact are considered *prima facie* true and correct unless they are against the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence if 'the opposite conclusion is clearly evident' or where it is 'unreasonable, arbitrary, and not based upon any of the evidence.' " *Lyon*, 209 Ill. 2d at 271 (quoting *Snelson v. Kamm*, 204 Ill. 2d 1, 35 (2003)). Finally, we review a mixed question of law and fact for clear error. *Leone*, 2024 IL App (4th) 220753, ¶ 60.

¶ 72    Because this court will not reach constitutional questions if a case can be resolved on other grounds, we consider the parties' nonconstitutional arguments first. *Lyon*, 209 Ill. 2d at 271.

¶ 73                              B. DCFS's Jurisdiction

¶ 74    The parties first dispute whether DCFS lost jurisdiction over the matter, thereby rendering its indicated finding against Wright void. Specifically, Wright argues the eight-month period that transpired between the initial hotline report and DCFS's indicated finding far exceeded

the 60-day period within which DCFS must, under section 7.12 of the Act, determine whether a report is indicated or unfounded. See 325 ILCS 5/7.12 (West 2022).

¶ 75　　　　DCFS responds the time frame in section 7.12 is directory, not mandatory, and therefore, its failure to adhere to it did not deprive it of jurisdiction. We agree with DCFS.

¶ 76　　　　　　　　　　　　　　1. *The Applicable Law*

¶ 77　　　　Section 7.12 of the Act provides:

> "The Child Protective Service Unit shall determine, within 60 days, whether the report is 'indicated' or 'unfounded' and report it forthwith to the central register; where it is not possible to initiate or complete an investigation within 60 days the report may be deemed 'undetermined' provided every effort has been made to undertake a complete investigation. The Department may extend the period in which such determinations must be made in individual cases for additional periods of up to 30 days each for good cause shown. The Department shall by rule establish what shall constitute good cause." *Id.*

¶ 78　　　　For an administrative agency's findings and orders to be valid, the agency must abide by the procedures and rules set forth by the legislature. *Stull v. Department of Children & Family Services*, 239 Ill. App. 3d 325, 332 (1992). This is because administrative agencies derive their powers only from the statutes that create them, and where an agency fails to comply with a mandatory provision of a statute, the proceeding relating to that provision is void. *Id.* When an agency adopts rules pursuant to the statutory authority, they have the force of law and bind the agency to them, particularly where the agency's failure to adhere to those rules results in prejudice to the individual who is subject to the agency's authority. *Id.*

¶ 79　　　　　　A mandatory statutory provision is one where, when not followed, the proceeding to which it relates is rendered illegal and void. *Cooper v. Department of Children & Family Services*, 234 Ill. App. 3d 474, 481 (1992). By contrast, a directory statutory provision is one where the failure to follow it will not render the proceeding relating to it invalid. *Id.* "[W]hether a particular statutory provision is mandatory or directory depends upon the intent of the legislature, which is ascertained by examining the nature and object of the statute and the consequences which would result from any given construction." *Id.*

¶ 80　　　　　　Statutory language issuing a procedural command to a government official is presumed to be directory. *In re M.I.*, 2013 IL 113776, ¶ 17. That presumption is overcome and the provision is considered mandatory "under either of two conditions: (1) when there is negative language prohibiting further action in the case of noncompliance or (2) when the right the provision is designed to protect would generally be injured under a directory reading." *Id.* Because whether a statute is mandatory or directory is a question of statutory construction, our review is *de novo*. *Id.* ¶ 15.

¶ 81　　　　　　　　　　　　　　　　　2. *This Case*

¶ 82　　　　　　Upon our review of section 7.12, we conclude the 60-day time frame within which DCFS is to determine whether a report is indicated or unfounded is directory. Section 7.12 contains no language prohibiting DCFS from continuing with its proceedings if it fails to complete its investigation within the allotted time limit. Similarly, the Act does not contemplate sanctions or grant the subject of an indicated report expungement when DCFS fails to comply with the time requirement. See *Cooper*, 234 Ill. App. 3d at 481-82 (stating a statute's timing requirements were directory where the provision lacked negative language that provided sanctions or denied performance by DCFS upon its failure to comply).

¶ 83          Nor would a directory reading of section 7.12 injure a right the Act is designed to protect. The purposes of the Act are "to protect children from neglect and abuse" and "to protect subjects [of reports of suspected child abuse or neglect] from the detrimental effect of inaccurate reports." *Shawgo v. Department of Children & Family Services*, 182 Ill. App. 3d 485, 490 (1989). Under Wright's mandatory view of section 7.12, DCFS's failure to abide by the 60-day investigatory time period would result in the agency's loss of jurisdiction to address charges of abuse or neglect, thereby frustrating its purpose of protecting children. By contrast, a directory construction would balance the Act's dual purposes, maintaining its interests in protecting children by facilitating the investigation of reports of abuse or neglect while ensuring accused individuals obtain prompt and accurate determinations that are the result of thorough investigations. Because (1) section 7.12 sets forth no sanctions for failing to comply with the 60-day time limit and (2) a directory construction of the provision would not injure any right the Act is designed to protect, we conclude the time limit is directory.

¶ 84          Wright nevertheless argues DCFS lost jurisdiction over the matter because the eight-month delay constituted a "gross deviation" of section 7.12's 60-day time limit and was, therefore, unreasonable under either a mandatory or directory construction of the statute. Wright relies upon *Stull*, 239 Ill. App. 3d 325, in making this argument.

¶ 85          In *Stull*, the appellate court reversed DCFS's denial of a teacher's request for expungement of the indicated finding against him because the 347-day delay between the teacher's request for expungement and the hearing on said request, plus an additional 80 days before DCFS rendered its final decision, constituted a "gross deviation" from the time limitation in section 7.16 of the Act (Ill. Rev. Stat. 1989, ch. 23, ¶ 2057.16). *Stull*, 239 Ill. App. 3d at 334-35. Section 7.16 then provided that DCFS's hearing on a request for expungement "shall be held within a reasonable

time after the subject's request" and a decision must be made "within 30 days" of the close of the hearing. Ill. Rev. Stat. 1989, ch. 23, ¶ 2057.16. The *Stull* court concluded that irrespective of whether the time limitations in the Act were mandatory or directory, the delay at issue was so gross a deviation that it could not be considered reasonable; accordingly, the teacher's constitutional right to procedural due process had been violated. *Stull*, 239 Ill. App. 3d at 335-36.

¶ 86        Wright's reliance on *Stull* is misplaced for several reasons. First, the appellate court's reversal in *Stull* of DCFS's refusal to expunge the record was premised upon a violation of the teacher's due process rights as a result of the delay, not because the delay deprived DCFS of jurisdiction over the matter. *Id.* at 334-36. Accordingly, *Stull* has no bearing upon the question of DCFS's jurisdiction here.

¶ 87        Second, unlike here, where Wright contests the length of the pre-deprivation investigatory process as provided in section 7.12, *Stull*'s conclusion rested upon the unreasonableness of the length of the *appeal* process in light of section 7.16. *Id.* at 335. Accordingly, just as *Stull* does not speak to DCFS's jurisdiction, it also does not speak to whether strict compliance with the pre-deprivation timing requirement in section 7.12 is required.

¶ 88        Because section 7.12's 60-day time frame within which DCFS had to determine whether the report against Wright was indicated or unfounded was merely directory and not mandatory, we reject Wright's argument that DCFS's failure to complete its investigation and issue its determination within that time deprived DCFS of jurisdiction over the matter.

¶ 89                    C. Manifest Weight of the Evidence

¶ 90        DCFS argues that the ALJ's indicated finding was not against the manifest weight of the evidence. It also argues that Wright forfeited his argument that the ALJ improperly considered E.B.'s hearsay statements because he did not object to the use of E.B.'s statements

during the hearing. DCFS further argues, in any event, (1) its regulations authorized the admission of E.B.'s statements and (2) the ALJ was within its power to find them credible. Therefore, DCFS asserts that because its indicated finding was supported by E.B.'s statements, it was not against the manifest weight of the evidence.

¶ 91 Wright argues the ALJ's decision was premised upon unreliable, inconsistent evidence—namely, E.B.'s hearsay statements that were testified to during the hearing and compiled in DCFS's investigative report. Accordingly, Wright contends that (1) the ALJ's reliance upon those statements was improper and (2) his own testimony regarding the events in the stairwell was the only competent, reliable evidence of what occurred. Thus, Wright asserts that the indicated finding was against the manifest weight of the evidence.

¶ 92 1. *Forfeiture*

¶ 93 Initially, we reject DCFS's contention that we should not consider Wright's argument regarding E.B.'s hearsay statements. Although Wright's objection to the introduction of DCFS's investigative report was premised predominantly on the irrelevance and prejudicial nature of unfounded reports discussed therein, we decline to apply forfeiture to Wright's hearsay arguments.

¶ 94 We recognize that Wright did not formally raise an explicit hearsay objection. Nevertheless, he challenged the introduction of the investigative report, which was comprised predominantly of E.B.'s hearsay statements, and the ALJ admitted the report over Wright's objection. DCFS itself acknowledged before the ALJ that because DCFS was unable to obtain a video recording of E.B.'s forensic interview, the ALJ's decision would be "a lot tougher without the benefit of viewing the CAC interview and hearing this from the victim's mouth."

¶ 95 Moreover, forfeiture is a limitation on the parties, and "we may relax the forfeiture

doctrine when necessary to maintain a uniform body of precedent or where the interests of justice so require." *Weipert v. Department of Professional Regulation*, 337 Ill. App. 3d 282, 286 (2003); see *Kimble v. Illinois State Board of Education*, 2014 IL App (1st) 123436, ¶ 80 (considering the plaintiff's hearsay arguments despite absence of a formal hearsay objection during the administrative hearing). This case presents one of those occasions.

¶ 96        Important to our relaxation of the forfeiture rule is an argument raised by DCFS's counsel at oral argument. Counsel asserted that even if Wright had explicitly raised a hearsay objection to E.B.'s statements before the ALJ, DCFS nevertheless would have successfully argued for their admission on the basis that its administrative rules permit the introduction into evidence of all prior statements of an abused minor when determining whether the abuse occurred. Implicit in counsel's argument is the suggestion that DCFS has *carte blanche* authority to admit any prior statements of that minor without regard to the statements' reliability or the availability of the minor to testify at the hearing. As we explain below, that cannot be so. Thus, in the interests of justice, we relax the forfeiture rule and address DCFS's consideration of E.B.'s hearsay statements.

¶ 97                                    2. *The Applicable Law*

¶ 98        The Act authorizes DCFS to maintain a registry of individuals found to have abused or neglected a child. 325 ILCS 5/1 *et seq.* (West 2022). An entry in the registry is considered an "indicated finding." *Julie Q. v. Department of Children & Family Services*, 2011 IL App (2d) 100643, ¶ 29. DCFS will make an indicated finding if it determines there is credible evidence of abuse or neglect. *Id.*; 89 Ill. Adm. Code 300.110(i)(3)(A) (1998). "Credible evidence" exists when the available facts, viewed in light of the surrounding circumstances, would cause a reasonable person to believe the child was abused or neglected. 89 Ill. Adm. Code 300.20 (2018).

¶ 99       The subject of an indicated finding has the right to challenge the finding in a hearing before an ALJ (89 Ill. Adm. Code 336.60(a) (2017)), and DCFS bears the burden to prove that the indicated finding is supported by a preponderance of the evidence. (89 Ill. Adm. Code 336.115(c)(2) (2017)). After the hearing, the ALJ makes a recommendation to the Director of DCFS, and the Director makes a final administrative decision (89 Ill. Adm. Code 336.220(a) (2017)), which is subject to judicial review under the Administrative Review Law (325 ILCS 5/11.6 (West 2024)).

¶ 100      This case involves an allegation of child abuse under allegation of harm No. 20, sexual exploitation, which DCFS regulations define as "the use of a child for sexual arousal, gratification, advantage, or profit." 89 Ill. Adm. Code 300.Appendix B (2017). Sexual exploitation includes, but is not limited to, indecent solicitation of a child or explicit verbal enticement, exposing sexual organs to a child for the purpose of sexual arousal or gratification, or "[o]ther behavior by an eligible perpetrator that, when considered in the context of the circumstances, would lead a reasonable person to conclude that sexual exploitation of a child has occurred." *Id.*

¶ 101                          3. *The ALJ's Consideration of Hearsay*

¶ 102      DCFS argues that, contrary to Wright's assertion, the ALJ's consideration of E.B.'s hearsay statements was proper because the admission of those statements was authorized by administrative rule. In support of this argument, DCFS notes that by its rules, in an administrative hearing, "the strict rules of evidence do not apply." 89 Ill. Adm. Code 336.120(b)(1) (2017). Accordingly, an ALJ may "allow into evidence all inculpatory and exculpatory evidence helpful in determining whether an indicated perpetrator abused or neglected a child, including oral and written reports and the investigative file, that the ALJ and the Director may rely upon to the extent of its probative value." *Id.* § 336.120(b)(9). Additionally, an ALJ may "allow into evidence

previous statements made by the child relating to abuse or neglect as hearsay exceptions." *Id.* § 336.120(b)(10). DCFS contends, therefore, the ALJ properly admitted and relied upon E.B.'s hearsay statements such that its indicated finding against Wright was not against the manifest weight of the evidence. We disagree.

¶ 103 "An administrative agency's authority to adopt rules and regulations is defined and limited by the enabling statute." *Julie Q.*, 2011 IL App (2d) 100643, ¶ 35. Thus, an agency's rules must conform with the scope of the enabling statute and cannot extend or alter that scope. *Id.* If a rule does not conform to the enabling statute, it is void *ab initio*. *Id.* To determine whether an agency's rule conforms to the enabling statute, we look to the legislature's intent, and if the language of the statute is plain, we need not conduct any additional inquiry. *Id.*

¶ 104 Section 4 of the enabling statute here, the Children and Family Services Act, provides that DCFS has the authority "[t]o make all rules necessary for the execution of its powers." 20 ILCS 505/4 (West 2022). However, section 4 also provides that the "provisions of the Illinois Administrative Procedure Act [5 ILCS 100/1-1 *et seq.* (West 2022)] are hereby expressly adopted and shall apply to all administrative rules and procedures of [DCFS] under this Act." 20 ILCS 505/4 (West 2024). The Illinois Administrative Procedure Act, in turn, provides in a contested hearing, the

> "rules of evidence and privilege as applied in civil cases in the circuit courts of this State shall be followed. Evidence not admissible under those rules of evidence may be admitted, however, (except where precluded by statute) if it is of a type commonly relied upon by reasonably prudent men in the conduct of their affairs." 5 ILCS 100/10-40(a) (West 2022).

¶ 105 4. *This Case*

¶ 106        We find *Julie Q.* instructive. In *Julie Q.*, the ALJ admitted the entirety of DCFS's investigative file, which included notes of an investigator about out-of-court statements made by the minor, who had accused her mother of locking her in a bedroom and drinking alcohol. *Julie Q.*, 2011 IL App (2d) 100643, ¶¶ 3, 17. The minor did not testify at the administrative hearing, and the only other evidence of what occurred during the alleged incident came from the mother, who testified she did not consume alcohol on the day of the alleged incident and did not lock the minor in her room. *Id.* ¶ 8. The Appellate Court, Second District, concluded the minor's hearsay statements, which came from the notes of a DCFS employee regarding what the minor, who had a history of untruthfulness, had told her, were inadmissible. *Id.* ¶¶ 17, 48. The court explained, contrary to section 10-40(a) of the Illinois Administrative Procedure Act, the minor's out-of-court statements were not "of the type commonly relied upon by reasonably prudent persons in the conduct of their affairs." *Id.* ¶ 52. Accordingly, because the only competent evidence about the alleged incident came from the mother, the court concluded DCFS's indicated finding of child neglect was against the manifest weight of the evidence. *Id.*

¶ 107        Here, E.B.'s hearsay statements were even more attenuated than the minor's in *Julie Q.* Because E.B. did not testify, the evidence to support E.B.'s allegations of what occurred in the stairwell consisted predominantly of Johnson's notes in DCFS's investigative file. Notably, because Johnson did not personally interview E.B., Johnson's notes simply relayed what E.B. had told *others* about the incident. For example, the evidence presented to support E.B.'s version of the events amounted to (1) Johnson's summary of Aguilar's police report, which itself relayed what E.B. told Aguilar, (2) Johnson's summary of what E.B. told Aguilar during her forensic interview, and (3) E.B.'s written statement.

¶ 108　　　　Importantly, E.B.'s hearsay statements were inconsistent with each other. According to the investigative file, on some occasions, E.B. asserted Wright "pulled [her] whole breast out [of her] shirt," while on other occasions, she claimed Wright merely pulled down the front of her spaghetti strap tank top with his finger and did not physically touch her. Additionally, E.B. had claimed on one occasion that Wright asked her why she did not wear a bra *before* Wright entered the stairwell, while on a different occasion, she claimed Wright asked her that question *while* they were in the stairwell. Moreover, in her written statement, E.B. claimed Wright told her to come into the stairwell because "he doesn't want anybody to think no weird stuff." However, E.B. did not claim Wright told her that during her forensic interview.

¶ 109　　　　On top of these inconsistencies, Wright asserted, and the record suggests, E.B. may have had a reason to fabricate the allegations. During Wright's testimony, he denied E.B.'s allegations and claimed that, although he had only ever been "nice to" E.B., "something *** happened that made her do this." To that point, the record indicated E.B. and her grandmother "clashed" because E.B. "wanted more space and freedom," which led to E.B.'s living with T.S. "to make things easier" for E.B. and her grandmother. Although Aguilar testified he found nothing in E.B.'s background "from the administrators at the school" to suggest she had any reason to fabricate the allegations, he made no mention of the "clash" between E.B. and her grandmother, which Wright argued could have contributed to attention-seeking behavior in the form of fabricating the allegations.

¶ 110　　　　In contrast to the inconsistencies in E.B.'s hearsay statements, the record contained evidence suggesting Wright's statements were reliable. For example, when Wright spoke with Aguilar, Wright claimed E.B. pulled down part of her shirt to show him her shoulder tattoo, which he identified as a "Manual Ram." No evidence beyond Wright's own statements was presented

explaining how Wright otherwise could have known E.B.'s tattoo was of a "Manual Ram." Indeed, the record indicated the school principal believed Wright's claim was "credible" because E.B. was known to show her tattoo to other teachers and was "not bashful about" doing so.

¶ 111    We earlier mentioned that DCFS bore the burden to prove that the indicated finding was supported by a preponderance of the evidence (*supra* ¶ 68). Given that burden, we find shocking Johnson's failure to determine whether Wright was telling the truth when Wright told Johnson that Wright learned *only after the fact* that the stairwell he and E.B. were in when this incident allegedly occurred was the only stairwell in the school without a security camera in it. It seems inconceivable to us that Wright would engage in this improper conduct with a student if he knew a security camera would capture it. Johnson should have made some effort during her investigation to ask school personnel (1) about what they knew about the locations of security cameras in the building, (2) whether these locations were ever discussed by the faculty, and (3) whether any of the faculty knew the stairwell in question was the only one in the school without a security camera in it.

¶ 112    And, of course, Johnson should have pursued these same questions directly with Wright when he said he learned only after the fact that the stairwell in question was without a security camera.

¶ 113    In light of the foregoing, we conclude the ALJ erred by considering E.B.'s hearsay statements. Although DCFS contends its administrative rules allowed the ALJ to consider E.B.'s hearsay statements, those rules cannot expand the powers granted to DCFS under the enabling statute. That enabling statute adopted the Administrative Procedure Act to apply to DCFS's administrative rules and procedures (20 ILCS 505/4 (West 2024)), which in turn allows evidence that is otherwise inadmissible under the rules of evidence as applied in civil cases only "if it is of

- 26 -

a type commonly relied upon by reasonably prudent men in the conduct of their affairs" (5 ILCS 100/10-40(a) (West 2024)). E.B.'s hearsay statements do not meet that definition. E.B. did not testify, and the video of her forensic interview was not entered into evidence. Without more, we determine no reasonably prudent person would rely on the notes in the investigative file regarding E.B.'s allegations, which consisted of little more than Johnson's relaying what E.B. told others. This is particularly so considering Johnson did not herself interview E.B.

¶ 114 Accordingly, we conclude the indicated finding against Wright was against the manifest weight of the evidence. Absent E.B.'s hearsay statements, the only competent evidence from someone with personal knowledge of what occurred in the stairwell was Wright. He testified E.B. told him she got a tattoo, and he responded, "[W]ell, let me see it." As he was about to exit the stairwell, E.B. stepped in and "pulled the little thing over and she showed [him] the tattoo." After Wright complimented the tattoo, E.B. told him "some guy" did it, and they exited the stairway.

¶ 115 Wright denied making sexual comments to E.B., touching her, or exposing her breasts. There was no competent evidence from anyone else with personal knowledge of what happened in the stairwell to support E.B.'s claim that Wright exposed her breast. Thus, we conclude DCFS's indicated finding was against the manifest weight of the evidence such that the trial court properly reversed DCFS's denial of Wright's request for expungement. *Julie Q.*, 2011 IL App (2d) 100643, ¶ 52 (holding and indicated finding was against the manifest weight of the evidence where, absent improperly considered hearsay testimony, the only competent evidence of someone with personal knowledge of the alleged incident was that of the plaintiff, who denied the allegations).

¶ 116     Because we affirm the trial court's reversal of DCFS's indicated finding on the basis it was against the manifest weight of the evidence, we need not address the parties' due process arguments.

¶ 117                    III. CONCLUSION

¶ 118     For the reasons stated, we affirm the decision of the trial court.

¶ 119     Affirmed.

¶ 120     JUSTICE DOHERTY, specially concurring:

¶ 121     I concur with the majority that DCFS's extensive—and almost exclusive—reliance on hearsay evidence necessitates relaxation of the rules of forfeiture and reversal of the agency's determination. Where I pause is the question of remedy: is it proper to reverse outright the determination based almost entirely on hearsay evidence or should the matter be reversed and remanded for a new hearing?

¶ 122     "[E]videntiary errors are generally remedied by ordering a new trial." *Timothy Whelan Law Associates, Ltd. v. Kruppe*, 409 Ill. App. 3d 359, 365 (2011); see also *Tzystuck v. Chicago Transit Authority*, 124 Ill. 2d 226, 243 (1988) (noting that improperly admitted evidence requires a new trial only where it appears to have affected the outcome of the trial). If the argument is that hearsay evidence was improperly admitted in the administrative hearing below, the remedy would normally be reversal and remandment for a new trial at which such evidence would not be received.

¶ 123     Here, Wright seeks a different course by alternatively framing the question as whether the administrative decision was against the manifest weight of the evidence, and in that regard, he asks us to examine the manifest weight of the evidence *without* the improperly admitted

hearsay. Whether we consider the hearsay evidence in assessing the manifest weight of the evidence will in all likelihood control the conclusion of our inquiry.

¶ 124    The path suggested by Wright has been followed by other courts. In *Julie Q. v. Department of Children & Family Services*, 2011 IL App (2d) 100643, ¶¶ 48, 56, for example, the court found that certain hearsay evidence was improperly admitted, and it reversed the department's finding outright. The court's analysis appears to indicate that it disregarded the improperly admitted evidence when assessing the manifest weight issue. *Id.* ¶ 52. Unfortunately, the court cited no authority for that approach and did not even discuss why outright reversal, as opposed to reversal and remandment for a new hearing, was appropriate.

¶ 125    On the other side of the ledger, other courts have held that in assessing the manifest weight of the evidence, all of the evidence—including improperly admitted evidence—should be considered. In *Kruppe*, the court relied on the general rule that the remedy for improperly admitted evidence is a new trial, not reversal outright:

> "Defendant next complains of several of the trial court's evidentiary rulings. He argues that the trial court's erroneous evidentiary rulings resulted in the jury's verdict being contrary to the manifest weight of the evidence. However, evidentiary errors are generally remedied by ordering a new trial. [Citation.] We will not strike any improperly admitted evidence, reweigh the balance of the evidence, and render a decision. Evidentiary rulings are reviewed for an abuse of the trial court's discretion. [Citation.] Hence, we will examine defendant's arguments, but we deem the proper remedy, should a remedy be necessary, to be a new trial." *Kruppe*, 409 Ill. App. 3d at 365.

¶ 126    Later, the court in *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 114, relied on *Kruppe* to conclude that, when examining the sufficiency of the evidence, the reviewing court must "consider *all* of the evidence that was before the trial court." (Emphasis in original.) The court also relied on *People v. Lopez*, 229 Ill. 2d 322, 366-67 (2008), for the same proposition.

¶ 127    At first blush, reliance on *Lopez* may be suspect because the issue there was one peculiar to criminal cases: determining whether, for purposes of avoiding the constitutional prohibition against double jeopardy, a defendant might be retried after an appellate reversal of his conviction. However, it should be noted that, even with a defendant's constitutional right at stake, the determination of outright reversal versus reversal for a new trial is made by reference to *all* of the evidence, not just the evidence properly admitted. *Id.* The approach taken in cases like *Julie Q.*—which considers only the properly admitted evidence in assessing manifest weight—actually puts a civil litigant in a more favorable position than a criminal defendant, even though only the latter carries a specific constitutional right against double jeopardy.

¶ 128    The foregoing demonstrates that there is a disparity in the approaches being taken in various cases when undertaking manifest weight review. Assessing whether the decision below is against the manifest weight of the evidence is an exercise undertaken by reviewing courts in a variety of different settings, and there is obvious reason why the nature of that review should change based on the type of case involved. Although the nature of the inquiry should be universal rather than case specific, we should also be cognizant of how reversing outright will ultimately operate under the facts of this case. DCFS went to the hearing in reliance on a specific rule permitting it to utilize hearsay evidence to make its case, and the application of that rule was not challenged at the administrative level. While we have relaxed the rules of forfeiture to find that the rule is invalid, we cannot reasonably expect that DCFS should have foreseen this turn of events at

the time of the hearing. It seems harsh to deny DCFS the opportunity, should it so choose, to make its case at a new hearing with proper evidence now that it knows it cannot rely on the rule allowing hearsay.

¶ 129 However, I have concluded that the Illinois Supreme Court's decision in *Fletcher v. Industrial Comm'n*, 44 Ill. 2d 359 (1970), suggests that the proper approach in this case is to disregard the inappropriately admitted hearsay evidence when assessing whether the decision below is against the manifest weight of the evidence. *Fletcher* stated as follows:

> "The principal issue before this court is whether the decision of the Industrial Commission is against the manifest weight of the evidence. Petitioner argues that the court should not consider the testimony concerning the X ray taken in 1952 because it was not produced at the hearing and therefore there was no basis for cross-examination by him. Lacking this opportunity the testimony should not have been admitted. Accordingly, we do not consider the testimony of Dr. Goldman with respect to the pathology revealed on that X ray." *Id.* at 361-62.

I note that *Fletcher*, like this case, arises out of an administrative setting (though, as noted above, it is unclear why that would make a difference to the manner in which manifest weight review is conducted).

¶ 130 Because *Fletcher* constitutes the supreme court's best available guidance on the point at issue, I concur with the majority's approach of assessing the manifest weight of the evidence by reference to only the properly admitted evidence. Following this approach, I agree that the administrative decision is against the manifest weight of the evidence and that outright reversal is required.

*Wright v. Department of Children & Family Services*, 2025 IL App (4th) 240049

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 23-MR-78; the Hon. Lisa Yvette Wilson, Judge, presiding. |
| **Attorneys for Appellant:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Alex S. Moe, Assistant Attorney General, of counsel), for appellants. |
| **Attorneys for Appellee:** | Stephen A. Yokich and Elizabeth L. Rowe, of Dowd, Bloch, Cervone, Auerbach, & Yokich, LLP, of Chicago, for appellee. |